**LITE DePALMA GREENBERG
  & AFANADOR, LLC**
Mindee J. Reuben
1515 Market Street, Suite 1200
Philadelphia, PA 19102
Tel: (215) 854-4060
mreuben@litedepalma.com

*Counsel for Plaintiffs and the Proposed Class*
(additional counsel on signature page)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| HEATHER ALTMAN and ELIZA WIATROSKI, individually and on behalf of all others similarly situated, | Civil Action No.: |
| Plaintiffs, | |
| vs. | **CLASS ACTION COMPLAINT** |
| CAESARS ENTERTAINMENT, INC., BOARDWALK REGENCY LLC d/b/a CAESARS ATLANTIC CITY HOTEL & CASINO, HARRAH'S ATLANTIC CITY OPERATING COMPANY, LLC d/b/a HARRAH'S RESORT ATLANTIC CITY HOTEL & CASINO, TROPICANA ATLANTIC CITY CORPORATION d/b/a TROPICANA CASINO AND RESORT ATLANTIC CITY, MGM RESORTS INTERNATIONAL, MARINA DISTRICT DEVELOPMENT COMPANY, LLC d/b/a BORGATA HOTEL CASINO & SPA, HARD ROCK INTERNATIONAL INC., SEMINOLE HARD ROCK SUPPORT SERVICES, LLC, BOARDWALK 1000, LLC d/b/a HARD ROCK HOTEL & CASINO ATLANTIC CITY, and CENDYN GROUP, LLC, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................1

II. PARTIES.....................................................................................................................7

    A. Plaintiffs ..........................................................................................................7

    B. Defendants .......................................................................................................8

    C. Co-Conspirators.............................................................................................12

III. JURISDICTION AND VENUE ...............................................................................13

IV. FACTUAL ALLEGATIONS ....................................................................................13

    A. The Atlantic City Casino-Hotel Market is the Relevant Antitrust Market. .................13

        1. Casino-Hotel Rooms Constitute the Relevant Product Market.......................14

        2. Atlantic City Is the Relevant Geographic Market. ..........................................17

        3. Casino-Hotel Defendants Possess a Dominant Share of the Market. ...........19

    B. Casino-Hotel Defendants Historically Priced Rooms Independently Based on Basic Economic Principles and the Industry's Established Business Model...............21

    C. Rainmaker's Pricing Algorithm Platform Enters the Marketplace and Gains Particular Traction Among Casino-Hotels. ...............................................23

    D. Casino-Hotel Defendants Start Using Rainmaker's Pricing Algorithm Platform and Eventually Acquire Market Power.......................................36

    E. Defendants Operate a Price-Fixing Conspiracy Centered on the Rainmaker Pricing Algorithm Platform That Has Produced Anticompetitive Effects.................47

    F. Defendants' Conduct Has No Pro-Competitive Benefits.................................67

    G. Economists, Academics and Regulators Recognize This Conduct Produces Anticompetitive Effects.......................................................................67

    H. This Market Has Characteristics That Make It Susceptible to the Effective Collusion That Has Occurred.................................................................71

        1. Defendants Had the Motive to Conspire.........................................................72

        2. Defendants Acted Against Their Independent Self-Interests. ........................76

        3. Multiple Forms of Traditional Conspiracy Evidence Exist.............................77

V. FRAUDULENT CONCEALMENT AND TOLLING ...............................................94

VI. CLASS ACTION ALLEGATIONS ...........................................................................97

VII. CAUSE OF ACTION ............................................................................................ 100

REQUEST FOR RELIEF .............................................................................................. 102

JURY TRIAL DEMAND .............................................................................................. 103

## LOCAL CIVIL RULE 10.1 STATEMENT

Pursuant to Local Civil Rule 10.1(b), the required information for Plaintiffs' counsel of record is provided above on the first page of the Complaint.

Pursuant to Local Civil Rule 10.1(a), the names and addresses of the Parties to this action are:

1. Plaintiff Heather Altman resides at 841 May Avenue, Deptford, New Jersey 08096.

2. Plaintiff Eliza Wiatroski resides at 8 Asbury Avenue, Freehold, New Jersey 07728.

3. Defendant Caesars Entertainment, Inc. has its principal place of business at 100 West Liberty Street, 12th Floor, Reno, Nevada 89501.

4. Defendant Boardwalk Regency LLC d/b/a Caesars Atlantic City Hotel & Casino has its principal place of business at 2100 Pacific Avenue, Atlantic City, New Jersey, 08401.

5. Defendant Harrah's Atlantic City Operating Company, LLC d/b/a Harrah's Resort Atlantic City Hotel & Casino has its principal place of business at 777 Harrah's Boulevard, Atlantic City, New Jersey 08401.

6. Defendant Tropicana Atlantic City Corporation d/b/a Tropicana Casino and Resort Atlantic City has its principal place of business at 2831 Boardwalk, Atlantic City, New Jersey 08401.

7. Defendant MGM Resorts International has its principal place of business at 3600 Las Vegas Boulevard South, Las Vegas, Nevada 89109.

8. Defendant Marina District Development Company, LLC d/b/a Borgata Hotel Casino & Spa has its principal place of business at 1 Borgata Way, Atlantic City, New Jersey 08401.

9. Defendant Hard Rock International Inc. has its principal place of business at 5701 Stirling Road, Davie, Florida 33314.

10. Defendant Seminole Hard Rock Support Services, LLC has its principal place of business at 5701 Stirling Road, Davie, Florida 33314.

11. Defendant Boardwalk 1000, LLC d/b/a Hard Rock Hotel & Casino Atlantic City has its principal place of business at 1000 Boardwalk, Atlantic City, New Jersey 08401.

12. Defendant Cendyn Group, LLC has its principal place of business at 980 N. Federal Highway, 2nd Floor, Boca Raton, Florida 33432.

Plaintiffs Heather Altman and Eliza Wiatroski ("Plaintiffs") bring this action individually and on behalf of a class of all others similarly situated against Defendants,[1] and allege the following.

## I.    INTRODUCTION

1.    Defendants are engaging in an ongoing conspiracy to fix, raise, and stabilize the prices of casino-hotel guest rooms in Atlantic City, New Jersey in violation of Section 1 of the Sherman Act. Casino-Hotel Defendants' knowing use of a shared pricing algorithm platform that Defendant Cendyn Group ("Cendyn") sells and promotes has enabled and facilitated an anticompetitive scheme that has caused Plaintiffs and class members to pay supra-competitive prices for guest rooms they have rented directly from Casino-Hotel Defendants or their co-conspirators from no later than June 28, 2018 to the present ("class period").

2.    Atlantic City is one of the nation's most iconic tourist destinations. It is known for its gambling, dining, entertainment, and lodging amenities—all available under one roof at any of its state-regulated casino-hotels. The city's appeal is enhanced by its famous beach and boardwalk located steps away from those resorts. Atlantic City has consistently ranked as the nation's second largest casino market since obtaining a state-wide monopoly nearly half a century ago.

3.    Casino-Hotel Defendants own and operate most of the casino-hotels in Atlantic City, with many having establishing roots decades ago. Casino-Hotel Defendants collectively possess a dominant share of guest rooms available for rent in Atlantic City casino-hotels (the "Atlantic City

---

[1] "Defendants" collectively reference the pricing algorithm platform's provider, Cendyn Group and predecessor The Rainmaker Group, and the Casino-Hotel Defendants that use it. References to Cendyn incorporate Rainmaker unless expressly noted otherwise or the context makes clear. "Casino-Hotel Defendants" reference the corporate parent defendants, Caesars Entertainment, MGM Resorts and Hard Rock International, and their respective Atlantic City casino-hotels. The Caesars Entertainment casino-hotels are Caesars Atlantic City (including Caesars Suites Atlantic City), Harrah's Atlantic City, Tropicana Atlantic City and, for the first two and a half years of the class period, Bally's Atlantic City. The MGM Resorts casino-hotel is Borgata (including the Water Club at Borgata). The Hard Rock International casino-hotel is Hard Rock Atlantic City.

Casino-Hotel Market"). Since June 28, 2018, Casino-Hotel Defendants collectively have possessed a market share of between at least 72% and 80% in the Atlantic City Casino-Hotel Market.

4.      Until recently, casino-hotels historically set their room rates independently from each other in response to market forces. Because casino-hotels primarily exist to increase demand for their on-site gaming activities, they historically offered low room rates to fill their hotels with guests who would gamble on their casino floors instead of their competitors.

5.      Decades later, two veteran consultants founded The Rainmaker Group ("Rainmaker"), which Cendyn later acquired, to help hospitality clients capture room revenue they believed was being lost during the process of competing for guests. Rainmaker developed and marketed a platform of pricing algorithm products—aptly titled "revolution" at the time—that these clients could use to recapture this lost revenue. Rainmaker gained a particularly strong following among casino-hotel operators and eventually became the self-proclaimed "market leader" in the space until industry giant Cendyn acquired it in 2019.

6.      The Rainmaker pricing algorithm platform—which Cendyn now calls "the hotel revenue and profit optimization cloud"—is designed to "optimize" the room rates its casino-hotel clients charge guests and "maximize" their corresponding hotel revenue. At a basic level, the algorithm platform works like this: Each casino-hotel client provides its current, non-public room pricing and occupancy data to the platform on a continuous basis. In turn, the algorithm continuously processes and analyzes this information, along with the same type of data the client's participating competitors also submit to the platform, and other relevant supply and demand-related data. The algorithm utilizes this continuous flow of real-time data to obtain a clear and complete picture of market supply and demand and competitive dynamics at any given time. The algorithm ultimately uses this information to generate "optimal" room rates, updated multiple times per day, for each client to charge guests.

7.     The products comprising the Rainmaker pricing algorithm platform—GuestREV, REVCaster, and GroupREV—enable casino-hotel clients to achieve higher rates and returns on guest rooms. GuestREV, Rainmaker's first and flagship product, forecasts market demand and recommends optimal rates for casino-hotels to charge on individual rooms. REVCaster, which Rainmaker acquired from a competitor in 2015, enables casino-hotels to monitor each other's room rates and "solve" the dilemma of guests' "competitor rate shopping." GroupREV, introduced as "the last missing piece of the puzzle for revenue optimization" and significantly improved in 2017, forecasts market demand for large group bookings.

8.     Casino-Hotel Defendants started using the Rainmaker pricing algorithm platform products at various times in the Atlantic City Casino-Hotel Market preceding the class period. But only after the market rebounded from a sustained period of financial distress did Casino-Hotel Defendants have the means, motive and ability to change their collective fortune.

9.     By June 28, 2018, all Casino-Hotel Defendants were using the Rainmaker pricing algorithm platform and possessed market power in the Atlantic City Casino-Hotel Market. By this date, the Atlantic City Casino-Hotel Market was in a state of economic recovery after years of financial setback. The conditions were in place for Casino-Hotel Defendants to raise room rates through their shared use of the Rainmaker platform to supra-competitive levels for a sustained period.

10.    Starting no later than this date, Casino-Hotel Defendants—with Rainmaker's (and later Cendyn's) active participation, promotion and coordination—knowingly used the same Rainmaker pricing algorithm platform to fix, stabilize, and artificially inflate rental prices for guest rooms. In doing so, Casino-Hotel Defendants replaced a historically independent room pricing system in Atlantic City with an interdependent, collusive one.

11.    Defendants have implemented, operated and maintained their anticompetitive scheme through high-ranking Rainmaker and Cendyn personnel and through Casino-Hotel Defendants'

3

executives, revenue management teams, and technology directors responsible for implementing room rates and related strategies. These individuals' names and positions, to the extent currently known, are noted below.

12.     It is hardly surprising Casino-Hotel Defendants decided to use the Rainmaker pricing algorithm platform given the representations made about its efficacy. Cendyn boasts that its clients can significantly increase their revenue by using the Rainmaker platform. It notes that clients adopt the algorithm's recommended room rates, of which clients like Casino-Hotel Defendants each receive hundreds of thousands of such rates per year, 90% of the time. (In other words, on average, for every 100 room rates the algorithm recommends for a given Cendyn client, the client accepts 90.)  Cendyn's client base, including Casino-Hotel Defendants, accept the algorithm's recommended room rates at such a high percentage because their revenues, according to Cendyn, increase "up to 15%" by doing so. Given these statistics, one Casino-Hotel Defendant's revenue management team commented on the utility of the platform in setting room rates, with one manager stating she "can't see getting by without it and another claiming "it's indispensable."

13.     Defendants' anticompetitive scheme has worked. The Rainmaker platform has enabled Casino-Hotel Defendants to obtain supra-competitive room rates and revenue during the class period. An analysis of relevant aggregate and individual Casino-Hotel Defendant statistics published by New Jersey gaming regulators confirms this. The numbers reveal substantial increases in room rates and revenue coupled with marked decreases in occupancy rates, while casino gaming revenue from the same period increased at a much lower rate. It is little wonder why one Casino-Hotel Defendant's management has recognized the platform's "positive impact" on "smarter, balanced pricing" that "drives higher revenues and profits."

14.     Casino-Hotel Defendants' shared use of the Rainmaker pricing algorithm platform, enabled and furthered by Cendyn, has allowed them to charge more for rooms while knowing that

4

their competitors would not lower their own room rates to take share—*i.e.*, what would have happened under normal competitive conditions.

15.     Cendyn has recognized that a coordinated approach is fundamental to achieve optimal success of its pricing algorithm platform in concentrated markets like this one. It consequently has heavily promoted collective adherence to the platform's pricing recommendations to clients like Casino-Hotel Defendants. Key Cendyn personnel pushed the notion that "revenue managers must recognize the ultimate goal is not chasing after occupancy growth," while advocating that clients should "avoid the infamous 'race to the bottom' when competition inevitably becomes fierce within a market." Cendyn personnel delivered this common messaging to "help hoteliers see the importance of a disciplined group revenue solution."

16.     This direct evidence of collusion is enough to prove an antitrust violation. Nevertheless, compelling circumstantial evidence also yields the same conclusion. Multiple factual enhancements, or "plus factors," render the market susceptible to effective collusion and, when considered together with Defendants' parallel conduct, demonstrate anticompetitive conduct.

17.     There is substantial evidence of (a) motive to conspire and (b) actions against interest, and there also are (c) various forms of traditional conspiracy evidence. *First*, Defendants had the motive to conspire given the structural features of the market and the financial setbacks Casino-Hotel Defendants faced in the years preceding the class period. *Second*, by raising room prices and restricting supply as the Rainmaker pricing algorithm platform recommended, Casino-Hotel Defendants acted in ways that would have been against their individual economic self-interests in the absence of coordination. *Finally*, various forms of traditional conspiracy evidence tend to demonstrate price-fixing: Casino-Hotel Defendants' radical change in business practice; Casino-Hotel Defendants' adoption of a common course of action; Defendants' opportunity to conspire during industry events and during smaller bilateral meetings; Casino-Hotel Defendants' exchange of competitively sensitive

pricing and capacity data by and through Cendyn; and a pending federal antitrust investigation into similar conduct involving a similar pricing algorithm.

18.     The anticompetitive effects of Defendants' scheme are as predictable as they are unfortunate. Regulators and economists who have studied the issue in depth have forecasted the very anticompetitive effects that have occurred here. Indeed, a former Federal Trade Commission Chair equated this conduct to "a group of competitors sub-contracting their pricing decisions to a common, outside agent" who "program[s] its algorithm to maximize industry-wide pricing" which "is then used" by these competitors "to maximize market-wide prices." She concluded that "this is fairly familiar territory for antitrust lawyers" no different from a traditional "hub-and-spoke conspiracy." Furthermore, a recent economic study confirmed that the use of a similar algorithm in concentrated markets "during boom" periods enabled users to increase prices more than non-users (yet still raising prices among all firms), before concluding that such patterns are consistent with collusion.

19.     Defendants' misconduct—centered on the coordination and setting of "optimal" pricing through a shared, centralized decisionmaker—is not meaningfully different than a traditional hub-and-spoke price-fixing conspiracy. Because this conduct is facially anticompetitive, *i.e.*, it produces clear anticompetitive effects and offers no procompetitive benefits, it is a naked restraint on trade that should be deemed illegal *per se*. But even if this conduct somehow benefitted competition and furthered consumer welfare in some minimal way (it does not), the anticompetitive effects would vastly outweigh any benefits and should be swiftly condemned under the rule of reason.

20.     Plaintiffs bring this suit on behalf of a class of all persons who directly rented hotel rooms from any Casino-Hotel Defendant or co-conspirator in Atlantic City during the class period to recover all damages and injunctive relief available under federal antitrust law.

II.    **PARTIES**

A.  **Plaintiffs**

21.    **Heather Altman.** Plaintiff Heather Altman ("Plaintiff") is a citizen and resident of the State of New Jersey. Plaintiff visited Atlantic City, New Jersey, and directly rented a room from one or more Casino-Hotel Defendants during the class period, including within the four years preceding the filing of this Complaint.

22.    For example, on or about February 17, 2023, Plaintiff stayed overnight in a Tropicana Atlantic City guest room, which she directly rented and paid through Caesar Entertainment's online booking platform.

23.    Plaintiff paid higher prices for the casino-hotel rooms she rented directly from Casino-Hotel Defendants by reason of the antitrust violation alleged in this Complaint. In addition, Plaintiff may directly rent guest rooms in Atlantic City, New Jersey, operated by one or more Casino-Hotel Defendants in the future.

24.    **Eliza Wiatroski**. Plaintiff Eliza Wiatroski ("Plaintiff") is a citizen and resident of the State of New Jersey. Plaintiff visited Atlantic City, New Jersey, and directly rented a room from one or more Casino-Hotel Defendants during the class period, including within the four years preceding the filing of this Complaint.

25.    For example, on or about May 14, 2022, Plaintiff stayed overnight in a Tropicana Atlantic City guest room, which she directly rented and paid through Caesar Entertainment's online booking platform.

26.    During the class period, including the past four years, Plaintiff also stayed overnight in guest rooms at Harrah's Atlantic City, Caesars Atlantic City, Borgata, and Hard Rock Atlantic City, which she directly rented and paid through the online booking platforms of Caesars Entertainment

(Harrah's Atlantic City and Caesars Atlantic City), MGM Resorts (Borgata), and Hard Rock International (Hard Rock Atlantic City).

27. Plaintiff paid higher prices for the casino-hotel rooms she rented directly from Casino-Hotel Defendants by reason of the antitrust violation alleged in this Complaint. In addition, Plaintiff may directly rent guest rooms in Atlantic City, New Jersey, operated by one or more Casino-Hotel Defendants in the future.

**B. Defendants**

28. **Caesars Entertainment Defendants.** Defendant Caesars Entertainment, Inc. ("Caesars Entertainment") is a publicly traded Delaware corporation headquartered in Reno, Nevada. Caesars Entertainment's investor materials state that it "is the largest casino-entertainment company in the U.S." and "the global leader in gaming and hospitality," "boasting many of the world's most prestigious gaming brands" including "Caesars," "Harrah's," and "Tropicana."

29. Caesars Entertainment, through wholly owned subsidiary Caesars Entertainment Operating Company, LLC, operates Defendant Boardwalk Regency LLC d/b/a Caesars Atlantic City Hotel & Casino ("Caesars Atlantic City"), Defendant Harrah's Atlantic City Operating Company, LLC d/b/a Harrah's Resort Atlantic City Hotel & Casino ("Harrah's Atlantic City"), and Defendant Tropicana Atlantic City Corporation d/b/a Tropicana Casino and Resort Atlantic City ("Tropicana Atlantic City"). Caesars Entertainment leases these casino-hotels' real estate from VICI Properties ("VICI"), a publicly traded real estate investment trust spun-off from Caesars Entertainment Corporation in its 2017 bankruptcy reorganization.

30. Defendant Caesars Atlantic City is a New Jersey corporation headquartered in Atlantic City, New Jersey. Caesars Atlantic City has rented hotel rooms directly to guests in Atlantic City, New Jersey during the class period.

31.     Caesars Atlantic City includes Caesars Suites Atlantic City, a property adjacent to Caesars Atlantic City that offers guests "upscale suites" and "a variety of VIP amenities during their stay." As Caesars Entertainment notes on its website, "Our Caesars Suites collection offers something to fit every lifestyle and budget."

32.     Caesars Atlantic City and Caesars Suites Atlantic City are collectively referenced in this Complaint as "Caesars Atlantic City."

33.     Defendant Harrah's Atlantic City is a New Jersey corporation headquartered in Atlantic City, New Jersey. Harrah's Atlantic City has rented hotel rooms directly to guests in Atlantic City, New Jersey, during the class period.

34.     Defendant Tropicana Atlantic City is a New Jersey corporation headquartered in Atlantic City, New Jersey. Tropicana Atlantic City has rented hotel rooms directly to guests in Atlantic City, New Jersey, during the class period.

35.     Caesars Entertainment and its Caesars Atlantic City, Harrah's Atlantic City, and Tropicana Atlantic City casino-hotels are clients of Cendyn and have used its Rainmaker pricing algorithm platform during the class period.

36.     Caesars Entertainment, through wholly owned subsidiary Caesars Entertainment Operating Company, LLC, operated Bally's Atlantic City Hotel & Casino ("Bally's Atlantic City"), a casino-hotel in Atlantic City, under lease from VICI until November 17, 2020. On November 18, 2020, Bally's Corporation acquired Bally's Atlantic City from Caesars Entertainment and VICI. Since then, Bally's Corporation has owned Premier Entertainment AC, LLC, which owns and operates Bally's Atlantic City.

37.     Bally's Atlantic City is a New Jersey corporation headquartered in Atlantic City, New Jersey. Bally's Atlantic City has rented hotel rooms directly to guests in Atlantic City, New Jersey, during the class period.

38.     Bally's Atlantic City was a client of Cendyn and used its Rainmaker pricing algorithm platform through at least November 16, 2020.

39.     **MGM Resorts Defendants.** Defendant MGM Resorts International ("MGM Resorts") is a publicly traded Delaware corporation headquartered in Las Vegas, Nevada. MGM Resorts, according to its investor relations materials, "is an S&P 500® global entertainment company with national and international locations featuring best-in-class hotels and casinos." "MGM Resorts creates immersive, iconic experiences through its suite of Las Vegas-inspired brands," and its portfolio contains numerous "unique hotel and gaming destinations globally, including some of the most recognizable resort brands in the industry."

40.     MGM Resorts, through wholly owned subsidiary Marina District Development Holding Company LLC, operates Defendant Marina District Development Company, LLC d/b/a Borgata Hotel Casino & Spa ("Borgata"), and leases this casino-hotel's real property from VICI.

41.     MGM Resorts fully acquired Borgata in June 2016 after buying Boyd Gaming's stake in the casino-hotel two months prior. Two months later, MGM Growth Properties acquired Borgata's real property from MGM Resorts and leased back that property to the MGM Resorts subsidiary, Marina District Development Holding Company LLC, that would operate the property. In August 2021, VICI announced it would acquire MGM Growth Properties, including its Borgata real property holding. That acquisition closed in April 2022.

42.     Defendant Borgata includes The Water Club at Borgata, a hotel connected to Borgata that was built in 2008. Borgata characterizes the two venues "an integrated casino, hotel and entertainment resort." On March 14, 2023, Borgata announced that The Water Club would be renamed MGM Tower, and that a corresponding renovation would be done by Memorial Day 2023.

43.     Borgata and The Water Club are collectively referenced herein as "Borgata."

44.     Defendant Borgata is a New Jersey corporation headquartered in Atlantic City, New Jersey. Borgata has rented hotel rooms directly to guests in Atlantic City, New Jersey, during the class period.

45.     MGM Resorts and its Borgata casino-hotel are clients of Cendyn and have used the Rainmaker pricing algorithm platform during the class period.

46.     **Hard Rock Defendants**. Defendant Hard Rock International, Inc. ("Hard Rock International") is a Florida corporation headquartered in Davie, Florida. The Seminole Tribe of Florida has wholly owned Hard Rock International since 2006. According to its website, "Hard Rock International is one of the most globally recognized companies with venues in over 70 countries spanning 265 locations that include owned/licensed or managed . . . Casinos[.]" The website also notes that "Hard Rock has solidified its place as one of the world's leading casino operators."

47.     Hard Rock International, through wholly owned subsidiary Hard Rock Tristate AC, LLC, owns and operates Defendant Boardwalk 1000, LLC d/b/a Hard Rock Hotel & Casino Atlantic City ("Hard Rock Atlantic City").

48.     Defendant Seminole Hard Rock Support Services, LLC is a Florida limited liability company headquartered in Davie, Florida. This entity "was established in" December 2016 "to consolidate and coordinate multiple staff functions of Hard Rock International and Seminole Gaming," and acts as "the IT business partner for the multibillion-dollar global entertainment company." Seminole Hard Rock Support Services coordinates Hard Rock-branded casino-hotels' use of IT and revenue management systems including the Rainmaker pricing algorithm platform.

49.     Defendant Hard Rock Atlantic City is a New Jersey limited liability company headquartered in Atlantic City, New Jersey. Hard Rock Atlantic City has rented hotel rooms directly to guests in Atlantic City, New Jersey, during the class period.

50. Hard Rock International and its Hard Rock Atlantic City casino-hotel are clients of Cendyn and, with active assistance and coordination by Seminole Hard Rock Support Services, have used the Rainmaker pricing algorithm platform during the class period.

51. All Defendants listed above collectively are referenced as "Casino-Hotel Defendants."

52. **Cendyn.** Defendant Cendyn Group, LLC ("Cendyn") is a Delaware corporation headquartered in Boca Raton, Florida, with additional domestic offices in Las Vegas, Nevada, Alpharetta, Georgia, and San Diego, California.

53. Private equity firm Accel-KKR has been Cendyn's majority owner since July 2019.

54. Cendyn describes itself as "the leading innovative cloud software and services provider for the hospitality industry," while noting that its "software solutions drive sales, marketing, and revenue performance for tens of thousands of hotels across the globe with a focus on integrated hotel CRM, hotel sales, and revenue strategy technology platforms."

55. Cendyn acquired The Rainmaker Group Unlimited, Inc. and its underlying hotel room pricing algorithm platform in August 2019 and subsequently operated it as a subsidiary called "Rainmaker, a Cendyn company" for a relatively short period of time before absorbing it.

56. The hotel room pricing algorithm products that Rainmaker Group and, subsequently, Cendyn have marketed and sold to hospitality industry clients, including casino-hotels, are referenced throughout the Complaint as the "Rainmaker pricing algorithm platform," "Rainmaker pricing algorithm products," and "Rainmaker products."

**C.  Co-Conspirators**

57. Various persons and entities known and unknown to Plaintiffs and not presently named as defendants in this action have participated as co-conspirators with Defendants in the alleged anticompetitive conduct and have performed acts and made statements in furtherance thereof.

## III.    JURISDICTION AND VENUE

58.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises out of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26.

59.    This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and New Jersey's long-arm statute, N.J. CT. R. 4:4-4.

60.    Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in the forum state, including the rental of casino-hotel rooms.

61.    Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the rental of casino-hotel rooms.

62.    Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## IV.    FACTUAL ALLEGATIONS

### A.    The Atlantic City Casino-Hotel Market is the Relevant Antitrust Market.

63.    The relevant antitrust market, to the extent one must be defined, is the Atlantic City Casino-Hotel Market. Industry observers and participants, including Casino-Hotel Defendants themselves, share this position, and fundamental economic principles confirm it.

64.    Atlantic City, known as "America's Playground" and "Monopoly City" at various times, has long been one of the nation's iconic tourist destinations. The city is synonymous with casino-hotels that offer a full array of upscale gambling, dining, entertainment, and lodging under one

roof. The city's unique appeal is enhanced by its famous beach and boardwalk. As testament to its popularity among tourists, Atlantic City consistently has ranked as the country's second largest casino market, generating billions of dollars in annual revenue.

65. Atlantic City has held a state-wide monopoly on casino-hotels since New Jersey voters first granted it the exclusive right to operate casinos in 1976. The New Jersey Division of Gaming Enforcement and the New Jersey Casino Control Commission regulate the industry by overseeing the city's casino-hotels pursuant to authority granted them under the New Jersey Casino Control Act.

66. New Jersey gaming regulators have applied the market definition alleged here in prior merger proceedings. In July 2020, the Casino Control Commission approved the Eldorado Resorts-Caesars Entertainment merger. The Commission did so after Caesars Entertainment agreed to divest Bally's Atlantic City to "reduce[] concerns about 'undue economic concentration'" in the Atlantic City casino market, as the *Washington Post* reported.

67. During the these proceedings, moreover, Caesars Entertainment's own hired expert economist applied the same market definition. In particular, the economist submitted a report analyzing casino-hotel market share statistics that "account[ed] for the proposed sale of" Bally's Atlantic City because they were "relevant to the question of whether the proposed merger . . . would result in undue economic concentration in Atlantic City casino operations." In other words, the economist analyzed the geographic effect of the proposed merger within the Atlantic City market.

68. Within the Atlantic City Casino-Hotel Market, the relevant product market is hotel rooms for rent in casino-hotels, and the relevant geographic market is Atlantic City.

### 1. Casino-Hotel Rooms Constitute the Relevant Product Market.

69. Casino-hotel rooms are economically separate and distinct products from rooms in traditional hotels, resorts, and other forms of rental lodging due to their unique offerings and accompanying business model.

70.     Guests stay at casino-hotels for the unmatched combination of attractions they offer: a full gambling experience with table games, slots and sports books; fine-dining restaurants, bars and nightclubs; exciting entertainment options like concerts, shows, and athletic events; full-service gyms, pools and spas; a wide array of retail shops; and conference facilities capable of hosting meetings of any size and duration.

71.     Because casino-hotels offer a package of amenities no other type of short-term rental lodging offers, other such venues are not substitutable with casino-hotels.

72.     Along these lines, casino-hotel operators like Casino-Hotel Defendants promote that they occupy a unique position within the hospitality industry and compete against other casino-hotels.

73.     MGM Resorts' Borgata calls itself "the market's leading casino-resort" that "offers an unparalleled travel experience" for overnight guests with an impressive wide array of "lavishly appointed guest rooms" and top-notch attractions "all under one roof:"



74.     Caesars Entertainment's 2021 annual report discusses the competitive environment it faces within "the casino entertainment business," adding that "[i]n most regions, we compete directly with other casino facilities operating in the immediate and surrounding areas." The gaming giant also claims it "has it all" while noting its "breadth of offerings," including its "finely appointed guest rooms," that are unique to casino-hotels:



75.     Hard Rock similarly highlights the attractions of its Hard Rock Atlantic City venue, claiming "there's no shortage of variety" and offering guests an experience "unlike any other:"

### Hard Rock Hotel & Casino Atlantic City

Get ready to experience the Hard Rock Hotel & Casino Atlantic City. Set on 17-acres, with the legendary Atlantic City Boardwalk as its backdrop, the Hard Rock Hotel & Casino Atlantic City will dial up the AC excitement with world-class entertainment and a music vibe unlike any other.

Upon arrival, guests can party it up on our expansive nightlife circuit, unwind with a drink in the lounge, or catch a show at the legendary 400-seat Hard Rock Cafe. There's no shortage of variety in our vibes. After a satisfying night out, guests will make their way to our lavish guest rooms and suites—decked out with the latest comforts, and featuring views of the city and the Atlantic Ocean.

76.     Industry commentators and participants also recognize that casino-hotels constitute a relevant product market due to their unique business model.

77.     "Casino hotels, which combine lodging with gaming operations, are a particular sector in the lodging industry," wrote Professors Hyewon Youn and Zhen Gu a 2010 *Journal of Hospitality Financial Management* article. James Klas, a consultant experienced in advising casino-hotels on economic and financial issues, explains why this is so. "Hotels affiliated with casinos operate in a different manner from typical, non-casino properties" because casino-hotels "are primarily ancillary facilities – they exist to serve casino patrons and boost casino demand." Thus, casino-hotels' "primary

competitors are other casino hotels," and they "do not necessarily compete for the lodging demand present in the market areas" against other providers.

78.     Casino-hotels share this view. One former Atlantic City casino-hotel operator's expert testified in court that casino-hotels derive the vast majority of their income from gaming, while traditional hotels generate the lion's share of their income from room rentals. *Atlantic City v. Ace Gaming, LLC*, 23 N.J. Tax. 70, 91 (2006). The expert further "described the casino hotel industry in a way that could never be confused with the operations of a conventional hotel." *Id.*

79.     Caesars Entertainment echoes this position. In its most recent annual report, the company stated that "our primary source of revenue is generated by casino properties' gaming operation," and that "we utilize our hotels, restaurants, bars, entertainment, racing, retail shops and other services to attract customers" to these gaming attractions.

80.     New Jersey courts have held that casino-hotels occupy a separate product market due to their "vastly different" business model. One court ruled that "casino hotels are not conventional hotels" because "the nature of the casino business, even with overnight accommodations available, is vastly different from that of a conventional hotel." *Ace Gaming, LLC*, 23 N.J. Tax. at 88-89 (also noting "casino-hotel" and "hotel" are defined differently under state law).

81.     Given these "vastly different" business models, it should not be surprising that the Federal Reserve of St. Louis's Economic Data resource provides data for the hospitality industry in separate Producer Price Indices: one for "Hotels and Motels, Except Casino Hotels," and another for "Casino Hotels."

### 2.     Atlantic City Is the Relevant Geographic Market.

82.     Atlantic City is an economically separate and distinct geographic area from other areas that offer a comparable casino-hotel resort experience to consumers. This is corroborated by industry analysts, courts, and Casino-Hotel Defendants themselves.

83.     New Jersey's state tourism division recognizes Atlantic City's distinct geographic position within the larger casino industry. It proclaims that "Atlantic City holds the distinction of being the East Coast's gaming and resort capital" and asks, "Where else in the United States can you find mega-resorts featuring the finest in gambling – coupled with headline entertainment, delicious dining and decadent spas – all within feet of a glistening ocean or calming back bay?"

84.     Casino-hotel operators and other industry stakeholders, including Casino-Hotel Defendants, share this view. The American Gaming Association, whose "membership includes commercial and tribal casino operators" and "other key stakeholders in the gaming industry," publishes an annual Commercial Gaming Revenue Tracker. This document "provides state-by-state and nationwide insight into the U.S. commercial gaming industry's financial performance." The most recent Tracker discussed the "Top Casino Markets" and provided the following table of "market rankings:"

| 2022 RANK | MARKET | STATE(S) | CY2022 GAMING REVENUE ($M)* | CHANGE OVER CY 2021 | 2021 RANK | |
|---|---|---|---|---|---|---|
| 1 | Las Vegas Strip | NV | $8,240.3 | 17.0% | 1 | — |
| 2 | Atlantic City | NJ | $2,789.6 | 8.5% | 2 | ▲ |
| 3 | Baltimore-Washington DC | DC/MD/WV | $2,175.0 | 8.7% | 4 | ▲ |
| 4 | Chicagoland | IL/IN | $2,136.5 | 6.1% | 3 | ▼ |
| 5 | Gulf Coast | MS | $1,600.2 | -0.5% | 5 | — |
| 6 | New York City | NY | $1,497.3 | 2.6% | 6 | — |
| 7 | Philadelphia | PA | $1,374.7 | -1.8% | 7 | — |
| 8 | Detroit | MI | $1,276.0 | -1.4% | 8 | — |
| 9 | St. Louis | MO/IL | $1,069.0 | 3.6% | 9 | — |
| 10 | Boulder Strip | NV | $966.6 | -0.1% | 10 | — |
| 11 | The Poconos | PA | $919.7 | 8.3% | 12 | ▲ |
| 12 | Reno/Sparks | NV | $910.7 | 2.4% | 11 | ▼ |
| 13 | Black Hawk/Central City | CO | $895.2 | 10.2% | 15 | ▲ |
| 14 | Lake Charles | LA | $877.7 | 4.2% | 13 | ▼ |
| 15 | Kansas City | MO/KS | $826.4 | 1.5% | 14 | ▼ |
| 16 | Downtown Las Vegas | NV | $787.1 | 7.6% | 16 | — |
| 17 | Pittsburgh/Meadowlands | PA | $664.6 | 5.5% | 20 | ▲ |
| 18 | Cincinnati Area | OH/IN | $661.2 | 1.0% | 18 | — |
| 19 | Tunica/Lula | MS | $636.4 | -8.6% | 17 | ▼ |
| 20 | Shreveport/Bossier City | LA | $600.9 | -6.9% | 19 | ▼ |

*Market gaming revenue encompasses slots, table games and retail sports betting, but not online sports betting or iGaming.
Source: American Gaming Association

85.     Caesars Entertainment publishes an annual "Market Sheet" for the "Atlantic City Market" that discusses its "footprint" in this region. In a June 2022 press release, the company announced a new investment in "the Atlantic City market," while noting that "Caesars Atlantic City has been an iconic destination on the Atlantic City Boardwalk and critical to the market's success over the years."

86.     Hard Rock Atlantic City President Anthony Faranca discussed his resort's position "in the Atlantic City market" in a November 2022 trade press article.

87.     Borgata President and Chief Operating Officer Travis Lunn discussed the "opportunity for the Borgata to up its own game and make sure it continues to be the market leader" for Atlantic City hotel-casinos in a March 2022 article. Speaking of "the investment and energy of [Borgata's] competition," he said, "I think that's a healthy thing for us, for the greater overall Atlantic City. A rising tide carries all ships."

88.     New Jersey courts also consider Atlantic City a proper geographic market. In analyzing property valuations and issuing appraisals, the state's Tax Court considers "the Atlantic City casino-hotel market" and "other casino hotels in Atlantic City." *Marina District Development Co., LLC v. Atlantic City*, 27 N.J. Tax. 469, 475-77, 484, 489, 504 (2013); *Ace Gaming, LLC*, 23 N.J. Tax. at 127.

### 3.     Casino-Hotel Defendants Possess a Dominant Share of the Market.

89.     Casino-Hotel Defendants collectively have possessed a dominant share of the Atlantic City Casino-Hotel Market during the class period.

90.     Between June 28, 2018—when Hard Rock Atlantic City opened—and November 16, 2020—the day before Caesars Entertainment sold Bally's Atlantic City to an outside company—Casino-Hotel Defendants jointly possessed an 80% market share. Since November 17, 2020, Casino-Hotel Defendants jointly have possessed a 72% market share.

91.     During the class period, the total number of guest rooms available for rent in casino-hotels in Atlantic City has remained constant. According to statistics published by the New Jersey Division of Gaming Enforcement and the New Jersey Casino Control Commission during this period, the total number of rooms available for rent in the nine Atlantic City casino-hotels has held steady at 15,109. Room number totals for each Casino-Hotel Defendant property follow.

92.     Caesars Entertainment's Atlantic City casino-hotels have had the following number of rooms and corresponding market shares during the class period:

| Caesars Entertainment Casino-Hotel | # Rooms | Share |
|---|---|---|
| Caesars Atlantic City | 1,145 | 7.6% |
| Harrah's Atlantic City | 2,590 | 17.1% |
| Tropicana Atlantic City | 2,364 | 15.6% |
| Bally's Atlantic City (until Nov. 16, 2020) | 1,214 | 8.0% |
| Total    June 28, 2018 – Nov. 16, 2020 | 4,939 | 48.3% |
|          Nov. 17, 2020 – Present | 6,098 | 40.3% |

93.     MGM Resorts' Atlantic City casino-hotel Borgata has had the following number of rooms and corresponding market share during the class period:

| MGM Resorts Casino-Hotel | # Rooms | Share |
|---|---|---|
| Borgata (incl. Water Club) | 2,767 | 18.3% |
| Total | 2,767 | 18.3% |

94.     Hard Rock International's Atlantic City casino-hotel has had the following number of rooms and corresponding market share during the class period:

| Hard Rock Casino-Hotel | # Rooms | Share |
|---|---|---|
| Hard Rock Atlantic City | 1,971 | 13.1% |
| Total | 1,971 | 13.1% |

**B.  Casino-Hotel Defendants Historically Priced Rooms Independently Based on Basic Economic Principles and the Industry's Established Business Model.**

95.     Casino-Hotel Defendants sell rooms directly to guests through both their proprietary booking channels as well as online travel agencies ("OTAs") using the agency (or commission) model. Class members (as defined below) have directly purchased rooms from one or more Casino-Hotel Defendants using one or both methods of direct purchase.

96.     Casino-Hotel Defendants sell rooms directly to guests over the phone and, predominantly, through their respective online booking platforms. Guests who want to book a room at any of Caesars Entertainment's three Atlantic City casino-hotels can do so by visiting Caesars' online booking platform, selecting the specific resort, desired date range, number of guests, and room type, and completing payment with a credit card or other digital payment mode. Guests go through similar processes to rent rooms for MGM Resorts' Borgata and Hard Rock International's Atlantic City venue using the respective online booking platforms.

97.     Casino-Hotel Defendants also sell rooms directly to guests through arrangements with online travel agencies ("OTAs") who use an agency model for such purchases. Under this model, the guest using the OTA is passed along to the casino-hotel's website, where the guest reserves the room on that website at the rate set by the casino-hotel, and the guest pays the casino-hotel directly at the time of checkout. The hotel pays the OTA a commission based on the total value of the booking either at the time of booking or after an agreed-upon time period.[2]

---

[2] In contrast, under the merchant model—the other main business model OTAs use—casino-hotels sell rooms at wholesale prices to OTAs. From there, the OTAs set room rates and sell the rooms to guests on their own sites. Contracts between hotels and OTAs using this method provide a set number of rooms to the OTA at a discounted rate, and the OTA makes money off each room sold provided it meets the contractual thresholds. Guest purchases made through the OTA merchant model are not included in the class.

98.     Casino-Hotel Defendants all sell rooms directly to guests using the nation's largest agency model-based OTAs like Booking Holdings, Expedia Group, and TripAdvisor, as well their numerous respective wholly-owned booking websites

99.     In a competitively functioning market, casino-hotels price rooms they sell directly to guests (under either method noted above) independently based on their own costs, supply and demand forecast, and market assessment.

100.    In the broader hospitality industry, as in many other capital-intensive industries, hotel operators face a large up-front investment to build a property. Once open, a hotel recoups these costs until eventually turning a profit. Additional profits are made on each additional room that is rented. Any empty hotel room amounts to lost revenue, so hotel operators in a competitive market work hard to fill each room by granting concessions or lowering prices. Basic laws of supply and demand thus dictate that operators of hotels, including casino-hotels, attempt to maximize their occupancy rates.

101.    An additional dynamic exists for casino-hotels in making their room pricing decisions. Because most revenue and profits derive from the properties' casino operations, rational profit-maximizing firms seek to fill their hotels as close to capacity as possible so each additional guest can spend money on gaming. An empty hotel room, on the other hand, not only amounts to forsaken hotel revenue, it also amounts to additional lost revenue on the casino floor. Thus, casino-hotels operating in a normally functioning market have even more incentive than non-casino-hotels to fill their hotels to capacity and keep guests out of competing properties by offering significantly reduced or free rooms.

102.    These economic tenets and competitive dynamics characterized the Atlantic City Casino-Hotel Market for decades.

C. **Rainmaker's Pricing Algorithm Platform Enters the Marketplace and Gains Particular Traction Among Casino-Hotels.**

103.     In the late 1990's, two consultants, Bruce Barfield and Tammy Farley, formed The Rainmaker Group ("Rainmaker"), a revenue management software company that developed and sold pricing algorithm products to property owners in the apartment and hospitality industries. In little more than a decade's time, Rainmaker had become the self-proclaimed "market leader in profit optimization solutions for the Gaming & Hospitality and Multifamily Housing industries."

104.     Regarding its Gaming & Hospitality business, Rainmaker believed that the room pricing model that casino-hotels had used with great success for decades still left a good deal of money on the table. So it developed and sold to hotel operators, and particularly casino-hotels, a room pricing algorithm platform that would allow operators like Casino-Hotel Defendants to extract this additional source of revenue from their guests.

105.     "Since gaming revenue typically is significantly higher than room revenue," as Rainmaker put it, "***casino hotels have traditionally left money on the table by over-discounting and comping rooms*** without the real-time data to back up those decisions." To change this dynamic, Rainmaker developed a "total revenue management approach" premised on "dynamic pricing" that made the old way of "fixed pricing . . . ***a thing of the past***."[3]

106.     "Dynamic pricing," according to Rainmaker successor Cendyn, "is a tactic that prices each room type based on a set of circumstances: the perceived value of the room type, the guest's willingness to pay, guest profile (such as loyalty status and booking behavior) and/or real-time demand and availability." "Dynamic pricing" not only "***reduce[s] the occurrence of free upgrades and entice[s] your guests to pay an upcharge instead,***" it also allows customers to "maximize top-line revenue." This new approach to room pricing is based on a "data-driven methodology" powered by

---

[3] All bolded and italicized quotation excerpts in this Complaint are added unless noted otherwise.

sophisticated pricing algorithm software "that has been successfully implemented by many casino properties," including Casino-Hotel Defendants, "in recent years."

107.    Rainmaker achieved its significant growth in large part through private funding. In September 2011, for example, Rainmaker received $9 million in debt financing from Silicon Valley Bank "to accelerate its growth." Little more than a year later, in October 2012, Rainmaker received a $33.8 million equity investment from Norwest Venture Partners ("NVP").

108.    According to the October 2012 Rainmaker press release announcing this investment, "Rainmaker will use the capital infusion to bolster its sales force, enhance its product portfolio and further develop new analytics and big data solutions to meet the needs of its growing customer base." The release added that "[w]ith this minority investment, NVP's Jon Kossow and David Su have joined Rainmaker's board of directors." Kossow, a general partner at NVP who would go on to become the firm's managing partner, noted that "Rainmaker represents an extremely compelling SaaS [Software-as-a-Service] investment opportunity" given its position as "a leader in the space" and his belief that "pricing and revenue management can unlock tremendous value in many enterprises," while adding that "We look forward to partnering with Rainmaker to expand the business further into new verticals and pursue key growth strategies." Kossow would go on to play a leading role in the sale of each of Rainmaker's business lines in the following years, and profited handsomely off of both.

109.    "In December 2017, Rainmaker announced the sale of its multifamily housing business" to real estate property management and data analytics software provider RealPage, "allowing the company to focus exclusively on the hotel and gaming industry," according to a February 2018 press release. Rainmaker did so for two more years, "partner[ing] with hotels, resorts and casinos to help them outperform their revenue and profit objectives." During this time, Rainmaker experienced "record-breaking performance and growth," increasing its "hospitality property deployments" by "an

astounding 64 percent" in one such year. Rainmaker's "market leader" status in this space caught the attention of larger firms in the "hotel tech" industry.

110.     In June 2019, private equity firm Accel-KKR acquired a majority stake in Cendyn, building on the position it first took in the company in 2016. Cendyn provides a full complement of management-focused cloud software to tens of thousands of hospitality industry clients worldwide. "The Cendyn Hospitality Cloud offers a complete set of software services for the industry, aligning marketing, sales, and revenue teams to optimize their strategies and drive performance and loyalty across their business units."

111.     Two months later, on August 1, 2019, Accel-KKR-backed Cendyn announced that it would acquire NVP-backed Rainmaker for an undisclosed sum.

112.     In a contemporaneous press release, Cendyn discussed "the hotel revenue and profit optimization cloud" it was acquiring in Rainmaker. Cendyn noted that "the company partners with hotels, resorts and casinos to help them outperform their revenue and profit objectives," while adding that its "cloud-based solutions for transient and group pricing optimization, forecasting, and revenue-centric business intelligence are designed to help hoteliers," among other things, "enhance revenue optimization processes."

113.     In the same release, Cendyn noted that the acquisition "will enable [it] to drive performance across all aspects of the hotel business, now including revenue management" and "will enable thousands of hotels, resorts and casinos around the globe to work with one partner to power their marketing, sales and revenue performance in an integrated fashion."

114.     Cendyn's then-President and CEO Tim Sullivan and Rainmaker's then-President Tammy Farley offered additional commentary on the acquisition in the same release. Sullivan, who played a leading role in executing and overseeing the acquisition, noted:

> We are thrilled to welcome The Rainmaker Group to the Cendyn
> family. With deep experience in hospitality and a long track record of

driving performance for their customers, we see a great alignment of our two companies and opportunity for continued innovation in the space. This acquisition will ultimately enable teams to work more closely together, providing alignment across sales, marketing, and revenue management. With our combined data-driven approach to pricing and marketing automation we will drive higher returns for our customers.

115.    Farley, who would "move to the role of board member" at Cendyn after the transaction closed, similarly stated:

Like Rainmaker, Cendyn has a been a global leader in the hospitality industry for many years. Our vision to deliver superior and demonstrable value to our customers is reflected in this exciting acquisition as we can now take our innovative revenue platforms to the next level with Cendyn.

116.    The Cendyn-Rainmaker transaction closed in or around October 2019.

117.    As a December 2022 *Global Gaming Business Magazine* article titled "Data and the Hotel" later commented, "Cendyn became a strong player in this space after its 2019 acquisition of hospitality heavyweight Rainmaker." "In Rainmaker," the article added, Cendyn "obtained a hotel revenue and profit optimization cloud."

118.    Cendyn operated the newly acquired company as a subsidiary called "Rainmaker, a Cendyn company" for a relatively short period before absorbing it entirely.

119.    Cendyn's acquisition of Rainmaker was one of several that Accel-KKR led in the "hotel tech" space around this period, travel industry publisher *Skift* reported. Accel-KKR's "long term goal is to sell the combined portfolio," *Skift* noted, while adding that the "low-hanging fruit for Cendyn is to boost cross-selling with Rainmaker" because "[t]he companies have somewhat overlapping client lists." *Skift* further observed that Cendyn "may have the momentum to boost Rainmaker," as "[i]t has more than 30,000 properties using its tools for customer relationship management, group sales, and other efforts."

120.     Following its acquisition of the smaller company, Cendyn marketed Rainmaker's pricing algorithm products under its own brand. With its global reach and client base, Cendyn has continued to expand the use of the Rainmaker pricing algorithm products among hospitality clients including casino-hotels.

121.     The Rainmaker hotel room pricing algorithm platform that Rainmaker pioneered and that Cendyn now sells consists of three separate but interrelated products:  GuestREV, GroupREV, and REVCaster.

122.     The following excerpts from Rainmaker's July 2016 archived website reveal at a fundamental level what its "Hospitality & Gaming Solutions" and "Multifamily Housing Solutions" delivered to clients:

- At Rainmaker, **we take your complex data** and **transform it to revenue opportunities** that help to grow your business.

- Real value is derived not from doing things the easy way, but from investing effort to build real insight – **that may not be obvious** – from real data and then **making it easy to apply** in real world conditions.

- Our software handles complexity to **deliver insights and recommendations** – through intuitive interfaces and reports – that **make your business more profitable**.

- Our growing portfolio of hospitality and gaming solutions enables our customers to distill the most complex datasets from **numerous data sources** into **highly prescriptive recommendations and actionable insights**.

123.     Each of the core Rainmaker "Hospitality & Gaming Solutions," collectively termed the Rainmaker pricing algorithm platform in this Complaint, is discussed below.

124.     **GuestREV** generates recommended optimal room rates for clients like Casino-Hotel Defendants to charge individual guests. Rainmaker boasted that this product enables clients to increase their room revenues by up to 12%.

125.    GuestREV, which is tailored to the casino-hotel industry, "is the market-leading revenue management and profit optimization solution for forecasting and pricing hotel rooms," as Rainmaker claimed in June 2016.

126.    GuestREV forecasts and recommends the "optimal" rates to charge guests "in real time" on a guest-by-guest and day-by-day basis. One key set of data the algorithm processes and analyzes in delivering its "highly prescriptive recommendations and actionable insights" is the contemporaneous room rates that the client and each participating competitor in the market charges.

127.    GuestREV Mobile, unveiled in March 2015 at the 11th annual Rainmaker Hospitality Client Summit, "enables anywhere-anytime access to the complete GuestREV pricing functions and reports in real-time via smartphone or tablet," according to Rainmaker's March 26, 2015 press release. GuestREV Mobile, according to its description on Google Play, "is designed to allow revenue managers to review data and implement pricing decisions from anywhere at anytime," and its "features include the ability to drill down into individual days' data to view revenue summaries and booking curves, review and update pricing and overbooking, and upload rates to your Property Management System." Casino-Hotel Defendants using this app would see the following screens, including one titled "Day Summary" that provided daily room rates for each competitor as well as the market:



128.    A 2019 Rainmaker marketing kit asserted that GuestREV "**enables hoteliers to better understand demand and set rates**" that "**increase revenue by up to 12%**":



129.    Cendyn's marketing materials similarly state that GuestREV enables clients to "**price each room type independently of overall demand**" while highlighting its "**90% rate acceptance**":



130.    Setting prices without regard for ordinary market forces is not how pricing should work in a competitive market.

131.    Cendyn notes that GuestREV "employs the most accurate valuation of [guests'] true revenue potential at the segment level." This valuation generates a "**market rate**" at the specific customer-segment level for each client, including Casino-Hotel Defendants, as shown below:



132.     Cendyn President and Chief Marketing Officer Michael Bennett promoted the benefits of "the Rainmaker suite," and "GuestRev" in particular, soon after Cendyn acquired Rainmaker. As he told *Hotelier Magazine* on January 3, 2020, "**Competitor rates can be used to influence the final price recommendation so hotels don't leave money on the table by pricing too far below competitors[.]**"

133.     One large casino-hotel who uses GuestREV is "pleased with the results" for this very reason. "It's a great tool for yield management," said Najam Khan, Executive Vice President and General Manager of Treasure Island Las Vegas. "As a user, you still need to be able to think critically, but **the system's capacity to factor in competitor rates and suggest optimal room rates to maximize revenue** is one of its best features."

134.     **GroupREV** generates optimal recommended room rates for clients including Casino-Hotel Defendants to charge groups of guests. As Rainmaker stated in June 2016, "GroupRev® can **improve group room revenue by 8% or more**."

135.     "Group business can represent up to 40% or more of revenue potential for hotels and casinos," Rainmaker noted back then. "GroupREV is an innovative **group pricing solution** designed to give group sales managers, directors of revenue management (DORMs) and other key revenue-responsible stakeholders the necessary tools to maximize group's tremendous potential by driving conversion rates and **increasing group revenues**."

136.    GroupREV allows clients to forecast "granular" demand for group-booking customers, like blocks of individuals attending conferences, conventions, and trade shows, "by day and by group segment."

137.    In 2017, Rainmaker "launche[d] a major enhancement" to GroupREV by "adding automated group forecasting capabilities to the platform." As one article reported, this addition "provides the unique ability to *project future group business demand*" and "*allows hotel revenue managers to significantly improve the accuracy of their pricing*."

138.    One large client's revenue manager reportedly said that "Rainmaker's automated group forecasting element is the last missing piece of the puzzle for revenue optimization." For its part, Rainmaker projected that the "addition of group-forecasting capabilities to Rainmaker solutions" would "drive increased revenues for its hotel and casino clients."

139.    A sample GroupREV dashboard generated a recommended room rate for the "Group Corporate" "Market Segment" for each day in the selected range:



140.    A Rainmaker 2019 marketing kit noted that GroupREV allows clients to "*move beyond Minimum Acceptable Rates (MARs)*" because it "*optimizes group pricing* for *each*

*individual piece of business*" due to the "***right data***." Rainmaker further noted that this product can "***improve Group Room Revenue by up to 8.4% or more***":



141.    **REVCaster** is a "tool" that, according to Rainmaker, "***monitors rate parity***" and "***solves for competitive rate shopping***" by guests. This product helps clients like Casino-Hotel Defendants "***quickly drill down into their position against the competition to set room rates more competitively and proactively,***" thus "bring[ing] increased opportunity to ***drive higher profits***."

142.    REVCaster, as Rainmaker promoted it to clients, "puts actionable market data right at your fingertips so you can monitor competitor rates for greater insight into market demand and gain deeper visibility into channel performance." "Developed by hoteliers for hotel operators," the tool "collects market-specific hotel price information" from clients' competitors and "provides easy-to-use reports and data downloads that increase revenue for clients."

143.    Rainmaker acquired the company that developed this product, Revcaster LLC, in March 2015 and incorporated the product into its platform soon thereafter.

144.    In the press release announcing the acquisition, Rainmaker noted that its "addition of the Revcaster™ solution expand[ed] and strengthen[ed]" its "comprehensive revenue management suite" while claiming it was the "***only solution that also solves for competitive rate shopping***." Rainmaker's then-Chief Strategy Officer Amar Duggasani noted that "[t]he Revcaster acquisition is

part of our continued strategy to provide effective analytical solutions that increase revenue for operators in the hospitality and gaming industry," and that "[t]here are no other hotel revenue management solutions that provide a market intelligence and competitor rate shopping solution."

145.     Revcaster LLC President Daniel Wise noted that REVCaster clients "**know rates and availability at all properties in their market**" as well as their "**average position against the competition**." Indeed, the regional operations director for client Westmont Hospitality Group, Vinay Zore, stated that REVCaster provides "**a clear, real-time understanding of their comp-set's rates to help us increase revenue**."

146.     A Rainmaker 2019 marketing kit described REVCaster as a "**tool that monitors rate parity**" and "brings increased opportunity to drive higher profits," while adding that the product was "designed by revenue managers" and "**driven by our users**":



147.     Rainmaker released the "next generation RevCaster platform" in 2017. An online article noted the product's "**data transparency** provides hoteliers with the relevant information they need to identify opportunities and to make pricing decisions and changes that will **drive better revenue outcomes** for their operation." "Key features" of the updated version include "**enhanced rate shopping tools**, which provide **competitive intelligence functionalities and analytics**."

148.     The above-referenced article showed a sample dashboard listing daily pricing data with tabs for "Rate Shopping" and "Benchmarking":



149.   Under the Rainmaker banner, REVCaster would go on to be named "2018's top rated Market Intelligence Software" by Hotel Tech Report.

150.   The Rainmaker pricing algorithm platform, including GuestREV, GroupREV and REVCaster, work together to significantly increase the hotel revenues of the clients who use it to set the room rates they charge to guests. Indeed, as early as January 2012, Rainmaker, through its then-Director of Sales for Gaming & Hospitality Tom Walker, informed an audience of existing and potential gaming clients that "***Rainmaker boosts revenues up to 15%***" for those using its platform:

> **Rainmaker boosts revenues up to 15%**
> "Rainmaker has a golden opportunity to help deliver even stronger results to our clients' bottom line," said Walker. "Now more than ever, gaming and hospitality companies are working to optimize the performance of every profit center. **With our system – which does exactly that – we have seen returns of up to 15%.**"

151.   Since that time, the accuracy, precision and efficacy of the Rainmaker pricing algorithm platform as a whole and the individual tools that comprise it have only improved, as Rainmaker and Cendyn have noted. These improvements have enabled clients to increase their revenue by even greater percentages in the years that followed. When those clients have the power to collectively control prices in a particular market, like Casino-Hotel Defendants do here, their collective use of the platform has boosted their hotel revenues to an even higher degree.

152.    Cendyn states that the Rainmaker platform empowers casino-hotels to "use [their] guest intelligence to price dynamically" while avoiding inaccurate room pricing decisions "based only on total hotel demand and availability dynamics" and to "entice your guests to pay an upcharge." Thus, as Cendyn tells existing and potential clients, "***the unwavering accuracy of our algorithms*** gives you the confidence to ***provide precision pricing for every guest***" and "***capitalize on lost revenue opportunities***."

153.    The Rainmaker pricing algorithm platform thus allows clients like Casino-Hotel Defendants to sit back and let the algorithm do the work and generate optimal room rates to charge their guests. For this reason, Cendyn discourages clients including Casino-Hotel Defendants from lowering room rates to gain market share and grow overall revenue at their competitors' expense, instead exhorting them to avoid price wars at all costs.

154.    Dan Skodol, former Cendyn Vice President of Data Science and Analytics and Rainmaker Vice President of Revenue Analytics, stated in a May 2018 hospitality industry publication that "***revenue managers must recognize the ultimate goal is not chasing after occupancy growth***, but instead maximizing profits across all revenue streams." "This is best achieved," he said, through "optimal pricing strategies" that "leverage complex algorithms and extensive data sets." He similarly advocated in May 2020 that "***hotels avoid the infamous 'race to the bottom' when competition inevitably becomes fierce within a market.***"

155.    Casino-Hotel Defendants have heeded Cendyn's advice to let their shared pricing algorithm do the hard work, including "***detect[ing] unexpected events or anomalous patterns missed by human analysis***," as Rainmaker noted in 2016. Consequently, Casino-Hotel Defendants on average adopt 9 out of every 10 recommended room rates the platform generates for each of their relevant properties numerous times per day.

**D.   Casino-Hotel Defendants Start Using Rainmaker's Pricing Algorithm Platform and Eventually Acquire Market Power.**

156.    Casino-Hotel Defendants began using the Rainmaker pricing algorithm platform to set their room prices at various points in time leading up to the start of the class period. By the time the class period began, as discussed further below, Casino-Hotel Defendants were able to collectively use the Rainmaker platform to raise room prices to artificially high rates for a sustained period.

157.    **Caesars Entertainment, Caesars Atlantic City & Bally's Atlantic City.** In or around late 2004, Caesars Entertainment began using Rainmaker's products across its "entire domestic portfolio," according to an August 2004 Supply & Demand Chain Executive article. The company's domestic portfolio at the time included Caesars Atlantic City and Bally's Atlantic City.

158.    **Harrah's Atlantic City**. No later than 2009, Harrah's Atlantic City started using Rainmaker's products. In a January 2009 Rainmaker press release, the senior revenue management director for Harrah's Entertainment, the corporate parent of Harrah's Atlantic City that acquired Caesars Entertainment in 2005 before rebranding the combined company as Caesars Entertainment in 2010, stated that "our 33 properties"—which then included Harrah's Atlantic City, Caesars Atlantic City, and Bally's Atlantic City—"continue to use [Rainmaker's] revenue management system today."

159.    Caesars Entertainment employees have confirmed that the corporate parent and all its Atlantic City casino-hotels continued to use Rainmaker products in the ensuing years. For example, Shawn Cummings, Caesar Entertainment's Revenue Manager for Enterprise Analytics from 2008 to 2014, notes on LinkedIn that he "led yield management for four properties in a highly competitive Atlantic City market"—which included Harrah's Atlantic City, Caesars Atlantic City, and Bally's Atlantic Cit during this period—and "optimized revenue from pricing decisions made using Rainmaker GuestRev curves."

160.    Rainmaker continued to identify Caesars Entertainment as a major casino-hotel client in promotional pieces in later years. In a March 29, 2012 press release, for example, Rainmaker

36

highlighted Caesars Entertainment—which included Caesars Atlantic City, Bally's Atlantic City and Harrah's Atlantic City by that time—as one of its "leading casino/hotel organization" clients. And in its 2019 promotional materials, Rainmaker stated that "among the top brands that rely on Rainmaker solutions are Caesars Entertainment."

161.   **Borgata.** In late 2009, Borgata began using Rainmaker's products. On November 11, 2009, Rainmaker "announced today that it was selected by six new casino hotels to provide its 'revolution™ Product Suite,'" including "The Borgata Hotel Casino & Spa."

162.   Borgata's use of the Rainmaker pricing algorithm platform also is discussed on a later Cendyn website entry titled "Borgata Hotel Casino & Spa's success with GuestRev." As former Borgata Vice President of Information Technology John Forelli stated: "We turned to Cendyn because we knew it was the market leader in casino hotel optimization and that its system was state-of-the-art" that generates "a balanced pricing structure" where, "[a]side from setting rate minimums and maximums, *the team otherwise allows GuestRev to perform its mathematical magic*." The profile also quoted Sue Daigle, Borgata's Director of Revenue Management until August 2020. Daigle raved that "*GuestRev is literally my right hand*" and that "*I can't see getting by without it*" in setting room prices. A colleague confirmed the importance of GuestREV to Borgata's room pricing process: "Most of us in management wonder how we got along without it. *When we look at the calculations and analyses the system handles, we realize it's indispensable*."

163.   **MGM Resorts.** Borgata's corporate parent, MGM Resorts, was using the Rainmaker products when Borgata signed on. A November 21, 2010 *Hospitality Technology* article noted that Rainmaker "provides revenue optimization services to companies that include . . . MGM Resorts."

164.   MGM Resorts continued to use the Rainmaker platform in subsequent years. In a March 29, 2012 press release, for example, Rainmaker highlighted MGM Resorts as one of its "leading

casino/hotel organization" clients. And a 2019 Rainmaker marketing kit noted that "among the top brands that rely on Rainmaker solutions are . . . MGM Resorts."

165.    **Tropicana Atlantic City.** In 2009, a bankruptcy court approved Tropicana Atlantic City's sale to a group of Carl Icahn-led creditors, and New Jersey's Casino Control Commission approved the sale to Icahn Enterprises-controlled Tropicana Entertainment Inc. two months later. Tropicana Entertainment owned Tropicana Atlantic City and other Tropicana properties across the country. In March 2010, the Commission granted Tropicana Entertainment a casino license, and Tropicana Atlantic City re-opened.

166.    Around that time, Tropicana Atlantic City began using Rainmaker products. Gaming & Leisure Magazine's ("G&L") Fall 2015 edition, its earliest publicly available online edition, shows that "Tropicana" was using Rainmaker products as of that date:



167.    Tropicana Atlantic City continued to use the Rainmaker products after Eldorado Resorts acquired its parent in October 2018, as G&L's Spring 2019 edition confirms:



168.     Tropicana Atlantic City continued to use the Rainmaker products once it became a Caesar Entertainment branded property following the completion of the Eldorado Resorts-Caesars Entertainment merger on November 17, 2020.

169.     On or around November 17, 2020, Bally's Atlantic City may have stopped using Rainmaker products when Caesars Entertainment sold it to Bally's Corporation to receive state regulatory clearance for the merger.

170.     **Hard Rock International and Hard Rock Atlantic City.** In or around late June 2018, Hard Rock Atlantic City started using the Rainmaker pricing algorithm product platform. G&L's Spring 2019 edition, for instance, shows that the resort, which is part of the "Hard Rock Hotel & Casino" brand, was using these products by that time:



171.    Hard Rock International coordinates its casino-hotels' use of IT and revenue management systems, including the Rainmaker platform, through Seminole Hard Rock Support Services, "the IT business partner for the multibillion-dollar global entertainment company" "established in 2017 to consolidate and coordinate multiple staff functions of Hard Rock International and Seminole Gaming, which share corporate office space" and "are headed by Jim Allen."

172.    During the past year, Seminole Hard Rock Support Services posted a job opening on LinkedIn for "Revenue Management Manager" of Hard Rock Atlantic City. As the below job post excerpts show, the property's Revenue Management Manager is responsible for "maximizing room revenue and profit" through "recommend[ing] and implement[ing] changes to hotel pricing" in coordination with the "hotel leadership team," and must possess a "[s]trong knowledge of" the "Rainmaker" revenue management system:

**About the job**

This position is responsible for maximizing room revenue and profit associated across the customer segments of casino, transient, group and contract for the hotel. Recommends and maintains pricing, positioning, and management of inventory. Oversees the processes associated with maximizing revenue from existing demand, forecasting and opportunity analysis (to include seasonality, competitive, positioning and displacement). Responsible for the development of metrics, generation and review of reports, pricing, and implementation of strategies across channels to maximize profitability. Ensures all strategies are effectively implemented. Identifies future opportunities and effectively communicates strategies to the hotel leadership team.

- This position is out of the Davie, Florida office. It is available as a remote position.

REVENUE MANAGEMENT MANAGER in Davie, Florida | Careers at Seminole Hard Rock Support Services (icims.com)

**Responsibilities**

- Excellent personal management skills; time management, meeting deadlines, effective communication and presentations skills.
- Conducts research, surveys, personal investigation and studies market place and territory in order to effectively capitalize on the casino's strengths and competitor's weaknesses.
- Responsible for recommending and development of Hotel room revenue annual budget.
- Forecasts hotel demand at a daily, weekly, monthly and annual basis.
- Maximizes revenue generated by the hotel in both cash and casino play
- Recommends and implements changes to hotel pricing, as well as recommending pricing for group as well as other internal and external room blocks
- Analyzes robust data sets from a variety of sources, including but not limited to: Slots, Table Games, F&B, Hotel revenue streams
- Set and manage appropriate yield controls to maximize the hotel revenue from all distribution channels
- Accurate preparation and analysis of market segmentation reports, production reports, source contribution analysis, daily pick-up reports, and pace summaries.
- Conducts audits to guarantee sell strategy is set correctly in all channels.
- Leads weekly revenue management meetings, and prepare Revenue Management Report information for all related meetings.
- Monitor and analyze the competition daily / weekly through shop reports and the Internet to identify selling strategies and market trends.
- Solve inventory management issues and assist with PMS, RMS, & other systems technical issues, upgrades, and decisions.
- Ensures that sales strategies and rate restrictions are implemented, communicated and modified as market conditions fluctuate.

**Qualifications**

- Bachelor's Degree preferred, 5+ years in Revenue Management experience in a similar setting preferred.
- Experience in strategic analysis (hotel/resort/casino opening or expansion experience preferred)
- Excellent understanding of total revenue management concepts, processes, and systems.
- Ability to develop strong relationships through frequent communication and the use of professional, courteous and ethical interpersonal interaction.
- Must be proficient in MS Office software, mainly Excel, Outlook, Access, PowerPoint, and SharePoint. Strong knowledge of LMS, CMP, SQL, Forward Distribution platforms and extranets, Rainmaker RMS, or be proficient with similar programs.

173.    Notably, Hard Rock Atlantic City's current and immediate past Presidents are industry veterans who previously ran casino-hotels that also use Rainmaker. Joe Lupo, the former second-in-charge at Borgata and former head of Hard Rock's Tampa casino-hotel, was Hard Rock Atlantic City's President from November 2018 until January 2023, when Hard Rock International announced he would lead The Mirage casino-hotel in Las Vegas following its acquisition of that property from MGM

Resorts. Borgata and Hard Rock Tampa both used Rainmaker's products while he managed those venues. Current President George Goldhoff, who replaced Lupo, previously ran Hard Rock's Cincinnati casino-hotel, which also used the Rainmaker platform during the three years he spent there.

174. Cendyn currently identifies Caesars Entertainment (and thus Caesars Atlantic City, Harrah's Atlantic City, and Tropicana Atlantic City), Borgata, and Hard Rock Hotel & Casino (and thus Hard Rock Atlantic City) as "just a few . . . of the hotel casino brands we work with globally" to "drive profitability" through its "integrated technology platform":



175. Each Casino-Hotel Defendant continues to use the Rainmaker pricing algorithm platform to set their room rates in Atlantic City.

176. Casino-Hotel Defendants not only have all used the Rainmaker products during the class period, they also have done so knowing each other were doing the same. Casino-Hotel

Defendants thus knew that their main competitors also were contributing their respective pricing and supply data to the same pricing algorithm platform that used this data to generate optimal guest room rates each one would adopt on nearly every guest room transaction.

177.    Casino-Hotel Defendants' knowledge of one another's use of the same pricing algorithm platform is demonstrated by, among other sources, industry publications, Rainmaker and Cendyn marketing materials, attendance at Rainmaker and Cendyn-led sessions at industry events, and one-on-one meetings they had with Rainmaker and Cendyn where best pricing practices and strategies were discussed. These sources are discussed below.

178.    Industry publications targeting, and read by, Casino-Hotel Defendants' relevant personnel, like executives, revenue managers, and information technology directors, show that they each used the Rainmaker products during the relevant period. Each edition of Gaming & Leisure magazine—"the leading industry management periodical" reaching "every business segment of a gaming and hospitality property"—included a section titled "G&L Community." This section listed the "Client Base" for certain casino industry vendors. Rainmaker, and Cendyn following the acquisition, consistently had an entry in this section identifying some of its "Client Base" for the Rainmaker products. Among the clients listed were each Casino-Hotel Defendant, as shown above.

179.    During industry events, Rainmaker and Cendyn personnel marketed the Rainmaker pricing algorithm products to casino-hotels including Casino-Hotel Defendants while promoting the financial gains clients could derive from using the products. These gatherings included Rainmaker's own conferences as well as conferences that Rainmaker attended and sponsored.

180.    Rainmaker's OPTIMIZE 2016 conference, held at Miami's Trump Doral Resort on February 17-19 and themed "Make Revenue Optimization Great Again," "convened more than 300 people for **three days of substantive sessions addressing the state of the industry and solutions that move beyond revenue management to profit optimization**." The conference featured "town

hall-style meetings that offered visitors a walk-through of Rainmaker products." "OPTIMIZE2016 was our most ambitious and well-attended conference yet," said Rainmaker President Tammy Farley. "*We did our utmost to share insights and changes to our technology, but we also wanted to give our attendees broader context for the work they do day-to-day*[.]"

181.     Rainmaker personnel also discussed its pricing algorithm platform with casino-hotel clients at the INFORMS 2017 Business Analytics Conference held at Caesars Entertainment's Caesars Palace casino-hotel in Las Vegas on April 2-4. The agenda for the "*strategic session*" that Rainmaker led provided:

> Hotels can forecast each segment's demand, determine the optimal mix based on the profitability of each segment, and then make pricing decisions that target this ratio. In its session at INFORMS, Rainmaker will show them how to do this, step by step, in order to yield the best results.

At the session, Rainmaker personnel "*present[ed] a step-by-step approach to total revenue optimization for casino and gaming properties*." Then-Vice President of Pricing and Revenue Management Services Angie Dobney "*detail[ed] the data-driven methodology behind the total revenue management approach that has been successfully implemented by many casino properties in recent years*." She also discussed the "*specific processes that revenue managers can use to strategically price and protect room inventory for the property's most valuable guests by segment, as well as by individual spending and play patterns*."

182.     Rainmaker's then-Vice President of Revenue Analytics Dan Skodol led sessions on revenue management and pricing strategy with hospitality industry audiences at Rainmaker-sponsored Hotel Data Conferences. For example, at the August 9-11, 2017 conference in Nashville, Tennessee, Skodol presided over a session "*designed to help guide hoteliers and revenue managers in devising pricing strategies* that take into account how consumers typically make decisions related to price and purchases." In the conference's lead-up, Rainmaker's Farley stated:

> *Improving forecasts and optimizing pricing for both transient and group business are the cornerstones of our business and essential components of a successful revenue management strategy.* We are proud to align ourselves with HDC as they continue to explore the growing role of data in these processes and *promote best practices that drive the industry forward.*

183.   Skodol also led a session titled "Group Revenue Management - Measuring Success" during the August 15-16, 2019 Hotel Data Conference in Nashville, Tennessee. Before the session, Skodol noted:

> Group Business is a key piece in revenue management strategy but is often not assessed the same way as transient and that can leave revenue on the table; *I believe sharing these case studies will help hoteliers see the importance of a disciplined group revenue solution*.

184.   In addition, Rainmaker and Cendyn personnel and Casino-Hotel Defendants' employees regularly attended Gaming & Leisure Roundtable. Farley and Barfield played a major role in Rainmaker's sponsorship of this organization's annual meeting and golf outing through late 2019, after which Cendyn personnel, including former Rainmaker managers, took the baton.

185.   Casino-Hotel Defendants' personnel have praised Gaming & Leisure Roundtable events for the opportunity it gives casino-hotels and key vendors like Cendyn to frankly discuss issues of common concern. As Caesars Entertainment's Senior Vice President of Information Technology Peter Broughton put it:

> *What other industry can say they gather together such a large percentage of gaming and hospitality management in one room to discuss current issues and solutions, and then allow us to network with all our vendors?*

Hard Rock Atlantic City's Vice President of Information Technology Donald Kneisel similarly remarked: "Who could put a value on a meeting of all the IT leaders in our industry in one place? No politics. *Just frank discussions. Sharing thoughts, feelings, and insights.* Wow!" And as MGM Resorts' Corporate Information Technology Lead Product Manager Fran Moore noted: "there are

45

*valuable discussions, insights and general interactions that afford the opportunity to gain perspective of the industry climate and gauge vendor direction.*"

186.    Finally, Casino-Hotel Defendants had discussions with Rainmaker and Cendyn representatives in connection with initial implementation of the pricing algorithm platform and afterwards. The "Rainmaker at a Glance" brochure discussed the "**expertise/consultation**" services it provided to clients during both types of meetings:

> Rainmaker includes tactical and strategic consultation as an integral part of every system implementation. This service is provided by a team of industry leaders with decades of experience in consulting, marketing, change management, hospitality operations, and corporate revenue management. The team assesses each organization's strengths and opportunities; assists in educating relevant stakeholders; advises of recommended business process shifts; shares industry best practices; and provides a step-by-step plan to maximize the benefit of profit optimization.
>
> Consulting services can also be provided outside of a system implementation in a variety of focus areas. These include, among others, revenue management readiness, customer valuation, pricing strategies, mix of business, and fine-tuning a new or existing revenue management program.

187.    Rainmaker in fact "**share[d] industry best practices**" with each Casino-Hotel Defendant while "**advis[ing] of recommended business process shifts**" and helping them "**maximize the benefit of profit optimization**" during platform system implementations.

188.    Rainmaker also provided additional "consulting services" to Casino-Hotel Defendants including "**pricing strategies**" and "**fine-tuning a new or existing revenue management program**." For example, in one press release, Rainmaker highlighted the "tight link between the companies that include[d] biweekly meetings" where "the teams" from Harrah's Entertainment (which subsequently became Caesars Entertainment) and Rainmaker "discuss[ed] ways to use the technology to meet the latest price optimization business challenges."

189.    The "team of industry leaders" who provided these "tactical and strategic consultation" services included Vikram Singh, Rainmaker's Vice President of Revenue Optimization from 2015-2017. In this role, according to his LinkedIn profile, Singh "overhaul[ed] and le[d] the managed pricing services team," which "focused on the formulation and execution of Rainmaker's revenue optimization services for their global portfolio of hospitality and gaming industry clients." In executing these responsibilities, he and his department provided "***fully managed pricing services***," "***customized consulting and personalized customer service***" to "***every client***," including "leading casinos" like "Hard Rock Casino and Hotels" and major "Caesars" properties. He also "***elevat[ed] all of Rainmaker's marketing efforts***, from developing marketing content and strategy to ***speaking at global industry events***" that Casino-Hotel Defendants attended.

190.    These types of facts, individually and collectively, establish that each Casino-Hotel Defendant knew the other Casino-Hotel Defendant were using the same pricing algorithm platform to set their room prices in Atlantic City during the class period.

### E.    Defendants Operate a Price-Fixing Conspiracy Centered on the Rainmaker Pricing Algorithm Platform That Has Produced Anticompetitive Effects.

191.    The Rainmaker pricing algorithm works most effectively by enabling and ensuring that competitors knowingly take the same approach to pricing—*i.e.*, collectively using the same mechanism that relies on the same type of data to generate the same type of optimal pricing for each one to charge—in a market over which they have collective power. This is not how genuine competitors should make independent pricing decisions in a properly functioning market. But that is what has occurred here.

192.    Starting in mid-2018, when economic conditions had begun to meaningfully improve following years of hardship, Casino-Hotel Defendants, who collectively had market power and incentive to recoup years of losses, began to conspire successfully through their shared use of the Rainmaker platform to set room prices at sustained supracompetitive levels.

193.     Defendants formed, maintained and operated a hub-and-spoke conspiracy to fix, raise and stabilize room rates through their knowing shared use of the Rainmaker pricing algorithm products—including GuestREV, GroupREV and REVCaster—and related reinforcing conduct that has had the purpose and effect of Casino-Hotel Defendants charging guests supra-competitive prices for room rentals during the class period.

194.     Rainmaker and Cendyn acted as the hub of this anticompetitive conspiracy through at least the following acts:

- They created, marketed, promoted, and coordinated Casino-Hotel Defendants' knowing shared use of a pricing algorithm platform that utilized all of their current pricing and supply data to recommend supra-competitive "optimal" room rates to charge guests;

- They promoted the supra-competitive rate at which clients including Casino-Hotel Defendants accepted the platform's recommended "optimal" room rates;

- They communicated each Casino-Hotel Defendants' use of the Rainmaker platform to the others through various means;

- They shared Casino-Hotel Defendants' respective competitively sensitive information on pricing and occupancy with each other through its REVCaster tool and under the auspices of "best practices" and "pricing strategies" during their meetings with each Casino-Hotel Defendant; and

- They encouraged Casino-Hotel Defendants to collectively exercise "discipline" and avoid a "race to the bottom" to capture share.

195.     Casino-Hotel Defendants acted as spokes of this anticompetitive conspiracy by taking various acts related to the Rainmaker pricing algorithm platform, including the following:

- They knowingly used the same third-party pricing algorithm platform that each of their co-defendants were using;

- They knowingly submitted their own current pricing and occupancy data to the same third-party algorithm platform to which their co-defendants were submitting their own respective current pricing and occupancy data;

- They knowingly received the same type of "optimal" recommended room rates generated by the platform that their co-defendants also were receiving;

- They understood that the recommended room rates they were receiving from the platform were based on the current pricing and occupancy data they and their co-defendants all were providing to the platform;

- They understood that their co-defendants also knew that the recommended room rates they each were receiving from the platform were based on the current pricing and occupancy data they and their co-defendants all were providing to the platform;

- They knowingly set their room rates based on the same type of "optimal" recommended room rates that their co-defendants were receiving;

- They understood that their co-defendants also were knowingly setting their room rates based on the same type of "optimal" recommended room rates that they were receiving;

- They monitored the current room rates each of their competitors were charging through real-time room rate data feeds provided by the platform; and

- They understood that their co-defendants also were monitoring the current room rates they were charging through real-time room rate data feeds provided by the platform.

196.    Casino-Hotel Defendants further acted as spokes of this anticompetitive conspiracy by engaging in related acts that monitored and reinforced the conspiracy, including the following:

- They knowingly shared competitively sensitive information, including current room pricing data, with each other through their shared use of the Rainmaker platform, where

they submitted their respective current room rate data to, and received and monitored their co-defendants' current room rate data from, REVCaster, and they each knew that the others were doing the same;

- They engaged in improper information sharing through regular and ad-hoc meetings and communications they had with Rainmaker and Cendyn where topics of discussion included pricing strategies and practices employed by their co-defendants; and

- They engaged in improper information sharing at industry conferences and events where they discussed directly with each other and through Rainmaker and Cendyn competitive pricing strategies and best practices on revenue management and room rate setting.

197.    In sum, Defendants implemented, operated and policed their anticompetitive conspiracy through their knowing shared use of the same Rainmaker pricing algorithm platform to set room rates and through communications among themselves that had the purpose and effect of furthering and reinforcing the conspiracy's anticompetitive goal.

198.    Defendants formed and have operated their anticompetitive scheme through high-ranking Rainmaker and Cendyn personnel and Casino-Hotel Defendants' respective groups of executives, managers, and other relevant employees with duties concerning hotel room pricing and revenue, including the individuals that follow.

(a) **Rainmaker**. Relevant personnel include former CEO Bruce Barfield, former President Tammy Farley, former VP of Pricing and Revenue Management Services Angie Dobney, former VP of Revenue Analytics Dan Skodol, former VP of Revenue Optimization Vikram Singh, former Senior Director for Strategic Commercial Initiatives Kevin Duncan, former Director of Sales for Gaming & Hospitality Tom Walker, and former Board member Jon Kossow.

- o <u>Barfield</u> and <u>Farley</u>, the company's co-founders, heavily promoted the Rainmaker platform and its impact on pricing and profitability to Casino-Hotel Defendants across various settings.

- o <u>Dobney</u>, <u>Skodol</u> and <u>Singh</u> promoted the platform to Casino-Hotel Defendants in various group and individual settings and through communicating with Casino-Hotel Defendants on industry practices and pricing strategies in connection with using the platform.[4]

- o <u>Duncan</u> was responsible for helping Rainmaker "align with the best hospitality companies" and develop "strategic partnerships" to "help hoteliers achieve greater profits." In this role, he frequently interacted with casino-hotel clients to promote the Rainmaker pricing algorithm platform, including during the period he served on the Board for HSMAI's Arizona chapter.

- o <u>Kossow</u> sat on Rainmaker's board between 2012 and 2019 and played a leading role in the company's strategic direction and growth in this timeframe, including its acquisition of Revcaster LLC and the sales of its apartment pricing algorithm to RealPage and its hotel pricing algorithm to Cendyn.

(b) **Cendyn**. Relevant personnel include former President and CEO Tim Sullivan, President and CMO Michael Bennett, VP of Product Management Kevin Duncan, Senior VP for Commercial-Customer Relationship Management Robert Magliozzi, former Senior Director for Strategic Commercial Initiatives Kevin Duncan, former VP of Enterprise Sales for Gaming and Casinos and Strategic Consultant Angie Dobney, and former VP of Data Science and Analytics Dan Skodol.

- o <u>Sullivan</u> managed an executive team that delivered "an integrated sales, marketing, e-commerce, and revenue optimization technology platform" for "thousands of hotels and resorts around the world." "During his time as CEO," he "drove continued growth through global expansion and strategic M&A," and oversaw the acquisition of Rainmaker.

---

[4] Before joining Rainmaker in 2013, Skodol was Director of Pricing and Revenue Management for apartment owner Archstone, where he "oversaw pricing and revenue management practices" and "administered, applied, and supported the Lease Rent Options (LRO) system used to derive pricing recommendations." As discussed elsewhere, Rainmaker sold LRO to apartment owners before competitor RealPage acquired this algorithm in 2017 and integrated it with its own pricing algorithm, YieldStar, to create the RealPage AI Revenue Management platform. Federal antitrust authorities reportedly opened an investigation recently into apartment owners' use of this pricing algorithm in setting tenants' rents.

o <u>Bennett</u> oversees the company's leading market position in revenue management and plays a key role in marketing the features and benefits of its platform, of which he is intimately familiar. A few months after the Rainmaker acquisition in January 2020, Bennett, who was listed as the media contact at Cendyn for inquiries on the deal, gave an in-depth discussion of Rainmaker's pricing algorithm products to *Hotelier Magazine*.

o <u>Duncan</u>, in his current role as VP of Product Management, is "defining the future of Commercial Strategy solutions to include revenue management systems, business intelligence, group strategy and pricing." Since he assumed this role in early 2022, he has sat on HSMAI's Las Vegas chapter's Board. He previously served as Senior Director for Strategic Product Initiatives, where he was "responsible for defining the future of Cendyn's Revenue Cloud products to include revenue management systems, business intelligence, group strategy and pricing." During this period, he attended the June 2022 HSMAI ROC. Before that, he held the title of Senior Director for Strategic Commercial Initiatives, which he assumed when Cendyn acquired his then-employer Rainmaker. He described this role on LinkedIn: "Taking the world's leading CRM environment and engaging with the science of the leading revenue and profit optimization cloud will take hospitality to the level of pricing it has been seeking for years."

o <u>Magliozzi</u>, <u>Dobney</u>, and <u>Skodol</u> were management-level employees who marketed the Rainmaker platform to and interacted across various settings with Casino-Hotel Defendants in various group and individual settings and through communicating with Casino-Hotel Defendants on industry practices and pricing strategies in connection with using the platform.

(c) **Casino-Hotel Defendants**. These defendants' respective groups of relevant personnel include executives who condoned their companies' use of Rainmaker products and knew their competitors were doing the same; resort-level leadership team members who approved their properties' use of Rainmaker products and knew their co-defendant resorts were doing the same; revenue management directors who used the Rainmaker platform and set corresponding hotel room rates and revenue strategies in consultation with resort leadership and Rainmaker and Cendyn personnel; and information technology managers who worked with the revenue management staff and Rainmaker and Cendyn personnel to implement, operate and maintain the Rainmaker platform. While discovery will reveal the specific identities and roles of each individual participant, the information below currently is known for each Casino-Hotel Defendant.

(d) **Caesars Entertainment**. Relevant personnel include CEO Thomas Reeg, President and COO Anthony Carano, Senior VP of Revenue Management Pavan Kapur, VPs of Revenue Management James Larsen and Nick Migliacci, Senior Director of Revenue Strategy Bobby Duck, Senior VP of IT Peter Broughton, and Regional President Steve Callender.

○ <u>Reeg</u>, who served as CEO of Eldorado since 2019 and "was instrumental in spearheading the acquisition of Caesars Entertainment Corporation in 2020," monitors and addresses hotel individual and group room rates, occupancy, and revenue results and trends for the company's properties in statements and during quarterly and annual earnings calls. In Caesars Entertainment's 2nd Quarter 2022 earnings call, for example, he "spoke broadly about room occupancy rates," projecting the direction "you should expect to see occupancy track" and the levels where "we'd expect to be back" in "September and beyond."

○ <u>Carano</u> oversees the company's day-to-day operations and monitors and addresses hotel room rates, occupancy, and revenue results and trends for the company's properties in statements and during quarterly and annual earnings calls.

○ <u>Kapur</u>, the Senior VP of Revenue Management who reports directly to Carano, lists his specialties to include "revenue management," "predictive modeling," "optimization," "advanced analytics," "competitive intelligence," and "pricing." He attended the 2015 Rainmaker Hospitality Client Summit and serves as a HSMAI Americas Board Member.

○ <u>Larsen</u> and <u>Migliacci</u> are responsible for "Total property Revenue Management . . . for ~50 casino-resorts in destinations like Las Vegas [and] Atlantic City," and oversee the Revenue Management Team's "forecasting, pricing, distribution, connectivity, [and] RM systems" "for our hospitality assets." The Revenue Management Team "is directly responsible for the pricing and utilization of the 53k hotel rooms across the company."

○ <u>Duck</u>, who has an "extensive background" in "Revenue Management," "provide[s] data-driven strategy recommendations," "support[s] all markets with hotels," and reports to the VPs of Revenue Management.

○ <u>Broughton</u>, who also sits on Gaming and Leisure's Board of Directors (discussed further below), "is an integral part of the Executive team" who works with fellow "seasoned executives" to "deliver cohesive and fully integrated systems that take advantage of technology and promote best practices," while using "software" "to create systems that exceed goals."

○ <u>Callender</u>, who served as Regional President for the company's Atlantic City properties from September 2019 until he retired in May 2021 and also was CANJ's President

during this period, "was a fixture of the Atlantic City gaming industry since its inception."

(e) **Caesars Atlantic City**. Relevant personnel include Regional Presidents and GMs Ron Baumann and Kevin Ortzman, and Senior VP and GM Joseph Lodise.

- o <u>Bauman</u> served as Caesars Entertainment's Regional President and GM for its three Atlantic City casino-hotels—Caesars Atlantic City and Harrah's Atlantic City from mid-2019 through early 2021, and for Bally's Atlantic City through mid-November 2020, "to improve the relative financial and market performance" of these "properties while also preparing the team for the [Eldorado Resorts] merger." He was responsible for and monitored the property's financial performance and statistics in all key areas, including hotel revenue and corresponding room rates and occupancy levels. Baumann reported to Caesars Entertainment Regional President Steve Callender following the late 2020 Eldorado-Caesars merger, and he replaced Ortzman upon his termination.

- o <u>Ortzman</u> "was responsible for directing all facets of the businesses, which included 10,000 employees across [three] hotels and casinos." He was responsible for and monitored the property's financial performance and statistics in all key areas, including hotel revenue and corresponding room rates and occupancy levels.

- o <u>Lodise</u> replaced Baumann upon his early 2021 departure to lead Caesars Atlantic City. He previously worked at Harrah's Atlantic City as its VP of Finance, where he was responsible for filing the property's financial reports to the Division of Gaming Enforcement. He also was responsible for and monitored the property's financial performance and statistics in all key areas, including hotel revenue and corresponding room rates and occupancy levels.

(f) **Harrah's Atlantic City**. Relevant personnel include Regional Presidents and GMs Ron Baumann and Kevin Ortzman and Senior VP and GM Gregg Klein.

- o <u>Bauman</u> held the same responsibilities for this property as he had for sister properties Caesars Atlantic City and, until it changed ownership in late 2020, Bally's Atlantic City, as noted above.

- o <u>Ortzman</u> held the same responsibilities for this property as he had for sister properties Caesars Atlantic City and, until it changed ownership in late 2020, Bally's Atlantic City, as noted above.

- o <u>Klein</u>, who replaced Baumann upon his early 2021 departure to lead Harrah's Atlantic City, previously worked at Tropicana Atlantic City. He was responsible for and monitored the property's financial performance and statistics in all key areas, including hotel revenue and corresponding room rates and occupancy levels.

(g) **Tropicana Atlantic City**. Relevant personnel include Senior VPs and GMs Joe Giunta and Jacqueline Grace and GM Steve Callender.

   o   These individuals all were responsible for and monitored the property's financial performance and statistics in all key areas, including hotel revenue and corresponding room rates and occupancy levels.

   o   In August 2022, Caesars Entertainment replaced <u>Grace</u>, who had served in this role since September 2020, with <u>Giunta</u>, "a veteran executive who has been with the company for 20 years," and "was most recently vice president of operations for Harrah's casino, which is also owned by Caesars Entertainment." Grace, along with Ron Baumann, reported to Steve Callender following the November 2020 Eldorado-Caesars merger and Callender's promotion to Caesars Entertainment Regional President.

   o   Before his post-merger promotion, <u>Callender</u> had been Tropicana Atlantic City's GM since late 2018 following Eldorado's acquisition of Tropicana Entertainment. Callender was brought on by Carl Icahn to turn around the property following his 2010 acquisition of its parent and "helped turn it into one of the city's strongest properties" through "his tremendous knowledge of the Atlantic City market." In this role (and his subsequent role at Caesars), he monitored the financial performance and trends of his properties and that of competitors, including hotel revenue and related statistics. According to a November 25, 2018 *Press of Atlantic City* article, "Callender said Eldorado and Tropicana recognize the evolving landscape of the market and are ready to adapt." He recognized that "the market is now starting to expand again," noting "Hard Rock and Ocean can grow the market" and have "shown that they can do that a little bit through entertainment and more rooms in the market," while adding "we're doing very well" and "remain second in the market behind only Borgata[.]"

(h) **Bally's Atlantic City**. Relevant personnel include Regional Presidents and GMs Ron Baumann and Kevin Ortzman and VP and GM Stephen Thayer.

   o   <u>Bauman</u> held the same responsibilities for this property until it changed ownership in late 2020 as he had for sister properties Caesars Atlantic City and Harrah's Atlantic City, as noted above.

   o   <u>Ortzman</u> held the same responsibilities for this property until it changed ownership in late 2020 as he had for sister properties Caesars Atlantic City and Harrah's Atlantic City, as noted above.

   o   <u>Thayer</u>, who had "decades of gaming and hospitality experience" including prior leadership stints at Harrah's Atlantic City, held this role from mid-2017 through late 2019. He had the same duties for this property as Bauman and Ortzman did.

(i) **MGM Resorts**. Relevant personnel include President and CEO William Hornbuckle, COO Corey Sanders, Vice President of Revenue Management Nick Naggar, Executive Director of Group Revenue Optimization Joni Peru, various Executive Directors of Revenue Management and Directors of Revenue Management like Scott Royals, Corporate IT Lead Product Manager Fran Moore, and Regional Revenue Manager Stephanie Kendrick.

- o  Hornbuckle, who "has been with MGM Resorts for more than two decades, "oversees all aspects of MGM Resorts' strategy, operations and hospitality and gaming development projects."

- o  Sanders "oversees the company's Las Vegas and regional properties as well as multiple corporate departments, including Hospitality" and "Gaming."

- o  Naggar, in his current role and prior similar role as VP of Group Revenue Optimization, "leads [the] corporate revenue management team which handles group revenue strategy and services for a casino & entertainment organization." Peru has a "wealth of revenue management" experience and lists the following relevant responsibilities on her professional resume: "Collaborate with the VP Group Revenue Optimization to create, execute and communicate the MGM Resorts portfolio convention/group strategy; Recommend, drive and continually improve processes for determining optimal group room rates/mix for MGMRI via revenue/profitability analysis; Conduct monthly joint meetings between Group Revenue Optimization and Sales Senior management teams to drive optimal group revenue and profit outcome for MGMRI; Direct communication of group revenue strategy and group financial and operational performance to other corporate groups and property leadership."

- o  Royals "provide[s] Revenue Management services to MGM Resorts International casino properties located in the Northeast region of the US." A self-described "Revenue Manager focusing largely on developing and facilitating a Revenue Management Culture in large convention hotel and gaming hotel companies," his "experience includes installation of automated revenue management systems" at various casinos, and he possesses the title of Certified Revenue Management Executive by HSMAI.

- o  Moore, who also sits on Gaming and Leisure's Board of Directors, has "over 25 years of industry experience" and possesses "[p]rofound leadership and management skills that align business fundamentals and best practices with solutions that produce practical and viable deliverables."

- o  Kendrick, who started this role in January 2021, is responsible for "[a]nalyz[ing] and prepar[ing] various reports for the Regional Properties" like "Borgata" on "all financial aspects of Revenue Management as they relate to yielding, budgeting, forecasting, and

revenue generation," and "for forecasting rooms and revenue, setting rates, and determining availability for each market segment, maximizing total REVPAR."

(j) **Borgata**. Relevant personnel include Presidents and COO Travis Lunn, former Presidents and COOs Melonie Johnson and Marcus Glover, former Director of Revenue Management Sue Daigle and former VP of IT John Forelli.

- o <u>Lunn</u>, <u>Johnson</u>, and <u>Glover</u> all had responsibility for "overseeing the resort's daily operations and providing strategic leadership and direction."

- o <u>Daigle</u>, who left in late 2020, "use[d] GuestRev to validate her pricing recommendations to management," and commented that the product "is literally my right hand. I can't see getting by without it."

- o <u>Forelli</u>, who left Borgata for MGM Resorts, decided with "other members of the executive team" to implement Rainmaker at Borgata, and later coordinated with Borgata revenue managers and Rainmaker staff.

(k) **Hard Rock International** and **Seminole Hard Rock Support Services**. Relevant personnel include Jim Allen, Hard Rock International Chair and CEO and Seminole Hard Rock Support Services CEO and Manager, Seminole Hard Rock Support Services Presidents Auggie Cipollini and Tracy Bradford, VP of Customer Care and Revenue Management Nadir Kiem, and VP of IT for Non-Gaming Systems Wendy Mertz.

- o <u>Allen</u> is regularly kept informed of Hard Rock Atlantic City's financial performance in all main areas, including hotel revenue and corresponding metrics like room rates and occupancy levels, by the property's President.

- o In <u>Cipollini</u>'s role as President of Support Services from early 2019 through mid-2022, "he was responsible for," among other things, "IT," "revenue management," "workforce analytics," and "property operations."

- o <u>Bradford</u>, who replaced Cipollini in this role upon his move to Hard Rock Atlantic City, has the same responsibilities in her position. She also currently sits on Hard Rock International's Senior Leadership Committee along with Jim Allen, Joe Lupo (see below), and others.

- o <u>Kiem</u>, who began his role in early 2022, is a "data-driven Customer and Operations Management Expert with 20+ year demonstrated history of success" who "Drives results via exceptional knowledge of system practices, precise functional mapping, and transparent communications of relationship between team roles and organizational results." His "core competencies" include "global service management and strategy

development," "capacity & budgetary planning & forecasting," "highly communicative culture establishment," and "A.I., robotics & technologies integration."

o <u>Mertz</u> began her position at Support Services in 2018. During her tenure "Mertz has been responsible for several multimillion-dollar system implementation and conversion projects." "She accomplished the task by choosing partners that were "known entities," she said. "Because we're a global brand, it's important to select partners that work in many countries, not only because property employees are familiar with the product but also because the partners can provide guidance regarding local requirements and offer in-country support." Among "Wendy's industry predictions" is that "Artificial intelligence and data analytics will continue to expand."

(l) **Hard Rock Atlantic City.** Relevant personnel include President George Goldhoff and former President Joe Lupo, General Manager Mike Sampson and former General Manager Anthony Faranca, Senior VP of Administration Auggie Cipollini, and VP of IT Don Kneisel.

o <u>Goldhoff,</u> and <u>Lupo</u> before him, were responsible for the property's financial performance, including the monitoring of hotel room rates, occupancy levels and revenue, and reported directly to Hard Rock International's Chair and CEO. <u>Goldhoff</u> started in January 2023 after leading Hard Rock's Cincinnati casino-hotel, which also used Rainmaker during his tenure, and, before that, managing MGM Resorts casino-hotels. <u>Lupo</u> has over three decades of industry experience and closely oversaw all aspects of Hard Rock Atlantic City's successful entry and financial performance, including hotel revenue.

o <u>Sampson</u>'s and <u>Faranca</u>'s position carries day-to-day management and performance responsibility for the Atlantic City property. <u>Sampson</u> claims "30+ years of Casino Marketing and Operations experience in many areas," with specialties in "operational efficiency" and "Margin and Bottom Line enhancement." Before becoming GM, he served as the property's Senior VP of Operations "and has been with Hard Rock Atlantic City since 2018, when he was a member of the Hard Rock Atlantic City pre-opening team." Before joining Hard Rock Atlantic City, he served as a VP of the Eastern Region for Caesar Entertainment. <u>Faranca</u> boasts a "comprehensive understanding of this market" and has "diverse management experience covering a wide range of disciplines including Gaming & Hotel Ops" and "Business Intelligence." He also served as a CANJ Board Member during his time at Hard Rock Atlantic City and previously worked for Caesars Entertainment.

o <u>Cipollini</u> joined Hard Rock Atlantic City in May 2022 to "oversee finance, IT, purchasing and retail," after serving as President of Seminole Hard Rock Support Services and, before that, as Borgata Senior VP of Operations from early 2009 through late 2016.

58

o Kneisel, who also serves on the Gaming and Leisure Board of Directors, "is recognized as one of the leaders" "when it comes to Information Technology in the gaming and hospitality industries." At Hard Rock Atlantic City and prior resorts, he has been "responsible for developing an Information Technology strategy, constantly evaluating emerging technologies which will enhance revenue streams" while "managing the day-to-day operations of the Information Technology functions."

199.    The anticompetitive scheme that ultimately would pay big dividends for Defendants was formed after, and motivated by, a period of sustained financial hardship they experienced.

200.    "After 29 years of year-over-year increases in gaming revenue, the tables turned" in Atlantic City during the Great Recession and the following years, as the Casino Control Commission noted in one of its annual reports. "Profits in Atlantic City fell and casino hotels closed" during the period of prolonged financial hardship that persisted between 2008 and 2016.

201.    "In 2016, the Atlantic City market continued to experience year-over-year declines," as Kevin Ortzman, Caesar Entertainment's then-Regional President and General Manager of Caesars Atlantic City, Harrah's Atlantic City, and Bally's Atlantic City, noted.

202.    Atlantic City casino-hotels' financial performance remained essentially flat in 2017. While the market's total gaming revenue and gross profit slightly exceeded its 2016 numbers, room rates and revenues dropped in 2017. But this would not remain the case for much longer.

203.    In 2018, Casino-Hotel Defendants' financial performance on the hotel side would catch up to and substantially surpass the rate of financial improvement on the gaming side. This was due to significant increases in room rates and corresponding revenue, particularly as the year progressed.

204.    A 2018 *The Press of Atlantic City* article reporting on the industry's first-half 2018 numbers noted that "year-to-date numbers were all down through the first six months of the year" compared to first-half 2017 numbers. But as 2018 progressed, casino-hotels' room revenue increased markedly compared to the same 2017 period's numbers.

205.     In the fourth quarter of 2018, for example, casino revenue totaled $390 million and represented a 3.1% increase over that quarter in 2017. Hotel revenue, however, saw a bigger proportional increase, with room revenue of $128 million for the last quarter of 2018 representing a 28.4% increase over the same period in 2017. The average room occupancy rate of 72.1% for fourth quarter 2022 was 8.1% lower than the same quarter in 2017, but the average room rate for fourth quarter 2022 was so much higher than the same quarter in 2017 that it allowed casino-hotels to receive much higher room revenue. In the end, "[t]he Industry's Hotel Rooms Revenue increased 8.2% from 2017," according to the New Jersey Casino Control Commission's 2018 annual report.

206.     Casino-Hotel Defendants' financial performance remained strong in 2019. This was particularly true for room rates and revenues, which resulted in hotel room revenue numbers proportionally outpacing casino revenue numbers to a significant degree, even though two casino-hotels entered the market in mid-2018.

207.     The Atlantic City Casino-Hotel Market, even more so than most other markets across the nation and worldwide, was hit hard by the coronavirus pandemic that surfaced in early 2020. As an April 2022 New Jersey Division of Gaming Enforcement press release noted: "In light of the casino hotel closures beginning March 16, 2020 through July 2, 2020 due to the COVID-19 pandemic and subsequent operating restrictions, the Net Revenue, Gross Operating Profit and Hotel Statistics for calendar 2021 are not comparable to 2020." Consequently, 2020 was an outlier year in terms of financial metrics in this market and must be viewed accordingly.

208.     The financial performance of the Atlantic City Casino-Hotel Market, including Casino-Hotel Defendants, picked back up in 2021. Total gross profits from 2021 eclipsed total gross profits from pre-pandemic 2019 by more than $170 million. Higher room rates and the resulting revenue continued to drive these returns.

209.    Casino-Hotel Defendants continued to perform well in 2022. The December 2022 Snapshot for the Atlantic City gaming industry, published by the Lloyd D. Levenson Institute of Gaming, Hospitality and Tourism at Stockton University's School of Business, noted the resorts' strong year-to-date performance "set up 2022 year-end, total brick-and-mortar revenues" to exceed those of 2021 and 2019. "This may be an indicator that the industry has recovered to pre-pandemic levels of brick-and-mortar gaming activity—an encouraging sign for the industry as a whole," the report stated. Trade publication *Casino.org* echoed these comments, noting on November 23, 2022 that "when compared with pre-pandemic 2019, business appears to be headed in the right direction."

210.    The market's 2022 revenue totals met expectations. As the New Jersey Division of Gaming Enforcement's April 2022 press release noted, net revenue reached $3.3 billion, "increasing 9.3% from the comparable period last year," with gross operating profits of $731.2 million.

211.    Atlantic City Casino-Hotel Market aggregate statistics confirm this observation while offering additional valuable takeaways. The city's casino-hotels collectively rented 5% fewer rooms but charged 25% more for those rooms in 2022 compared to 2019. This resulted in the casino-hotels receiving $18 more, or an additional 16.4%, for each rented room in 2022 than in 2019. The casino-hotels' gaming revenue for 2022, on the other hand, was virtually the same as 2019.

212.    The following table, compiled from periodic New Jersey Division of Gaming Enforcement filings and annual New Jersey Casino Control Commission reports, contains annual aggregate Atlantic City Casino-Hotel Market statistics for the class period (green)—including the outlier year of 2020 (yellow)—and for the period of time immediately preceding the class period (red):[5]

---

[5] Several points about the data in this and subsequent tables are worth noting. First, Hard Rock Atlantic City's 2018 numbers are from the second half of that year, as it opened for business in late June 2018. Second, from mid-2018 onward, nine casino-hotels have operated in the Atlantic City Casino-Hotel Market. In 2017, seven casino-hotels operated in the market. In 2016 and 2015, seven casino-hotels operated in the market.

| Year | Casino Revenue | Casino Revenue Change | Room Revenue | Room Revenue Change | Occupancy | Average Daily Room Rate | Revenue Per Available Room |
|------|---------------|----------------------|--------------|--------------------|-----------|------------------------|----------------------------|
| 2022 | $1.78 billion | 0.0% | $698 million | 13.0% | 73.40% | $177.89 | $130.57 |
| 2021 | $1.78 billion | 44.0% | $618 million | 93.1% | 67.60% | $172.88 | $116.87 |
| 2020 | $1.21 billion | -27.9% | $317 million | -47.8% | 61.70% | $138.52 | $85.47 |
| 2019 | $1.76 billion | 8.1% | $605 million | 12.7% | 78.97% | $142.11 | $112.12 |
| 2018 | $1.63 billion | 4.4% | $536 million | 8.3% | 80.70% | $137.03 | $110.65 |
| 2017[6] | $1.57 billion/ $2.56 billion | 1.6% | $495 million/ $391 million | -3.6% | 86.90% | $108.35 | $94.16 |
| 2016 | $2.52 billion | 0.9% | $405 million | -0.2% | 85.20% | no data | no data |
| 2015 | $2.50 billion | 3.1% | $406 million | 0.8% | 80.80% | no data | no data |

213.    This data shows that total average room rates and corresponding revenue significantly increased when Casino-Hotel Defendants collectively used the same pricing algorithm platform to set room rates. Starting no later than 3rd Quarter 2018, room revenues markedly rose, both compared to those totals from the prior year and in relation to corresponding casino revenue trends. Further, while occupancy levels trended downward during this period, average daily room rate (ADR) rose in amounts that more than made up for the lower occupancy rates, thus causing revenue per available room (RevPAR) to rise substantially year over year.[7]

---

[6] Effective January 1, 2018, the Financial Accounting Standards Board updated reporting requirements that primarily affected how casino-hotels recorded promotional allowances and accounted for liability associated with customer loyalty programs. As a result, promotional allowances offset and thus decreased reported casino revenue while increasing room revenue for that year and subsequent ones. For the table's 2017 entries, the casino and room revenue listed first reflect 2017's updated figures conforming with the 2018 reporting requirement, while the casino and room revenue listed second reflect 2017's originally reported figures under the old standards. All years after 2018 follow the 2018 requirements, while all years before 2018 follow the prior rule.

[7] ADR and RevPAR are industry metrics used to assess hotel performance. ADR is room revenue divided by number of rooms rented, and thus is used to calculate average rental revenue per occupied room. RevPAR is occupancy rate multiplied by ADR. RevPAR is similar to ADR but accounts for unoccupied rooms to show how rate and inventory interact to generate room revenue.

214. These tables, compiled from Division of Gaming Enforcement filings, contain annual room rate and occupancy data for each Casino-Hotel Defendant that tell more of the same story:



| Year | Occupancy | Average Daily Room Rate |
|------|-----------|-------------------------|
| 2022 | 81.0% | $182.59 |
| 2021 | 81.0% | $163.32 |
| 2020 | 77.6% | $126.76 |
| 2019 | 87.7% | $134.89 |
| 2018 | 85.6% | $140.60 |
| 2017 | 85.9% | $102.92 |
| 2016 | 92.2% | $104.19 |
| 2015 | 90.2% | $99.62 |



| Year | Occupancy | Average Daily Room Rate |
|------|-----------|-------------------------|
| 2022 | 67.9% | $162.02 |
| 2021 | 64.8% | $164.31 |
| 2020 | 60.5% | $120.34 |
| 2019 | 79.7% | $128.50 |
| 2018 | 82.7% | $121.32 |
| 2017 | 86.6% | $110.62 |
| 2016 | 84.5% | $105.97 |
| 2015 | 81.0% | $103.62 |



| Year | Occupancy | Average Daily Room Rate |
|------|-----------|-------------------------|
| 2022 | -- | -- |
| 2021 | -- | -- |
| 2020 | 70.8% | $121.08 |
| 2019 | 80.9% | $117.69 |
| 2018 | 83.5% | $107.42 |
| 2017 | 85.9% | $102.92 |
| 2016 | 85.1% | $100.83 |
| 2015 | 85.0% | $94.69 |



| Year | Occupancy | Average Daily Room Rate |
|------|-----------|-------------------------|
| 2022 | 68.4% | $172.39 |
| 2021 | 63.4% | $182.53 |
| 2020 | 54.9% | $145.47 |
| 2019 | 70.3% | $150.67 |
| 2018 | 79.5% | $140.24 |
| 2017 | 85.8% | $90.21 |
| 2016 | 81.1% | $93.79 |
| 2015 | 79.1% | $92.55 |





| Year | Occupancy | Average Daily Room Rate |
|------|-----------|-------------------------|
| 2022 | 70.1% | $174.65 |
| 2021 | 53.1% | $184.24 |
| 2020 | 50.9% | $160.38 |
| 2019 | 81.6% | $171.73 |
| 2018 | 84.8% | $179.64 |
| 2017 | 88.3% | $133.04 |
| 2016 | 89.0% | $132.96 |
| 2015 | 85.0% | $133.31 |

| Year | Occupancy | Average Daily Room Rate |
|------|-----------|-------------------------|
| 2022 | 88.6% | $158.11 |
| 2021 | 83.0% | $156.52 |
| 2020 | 66.7% | $112.22 |
| 2019 | 74.8% | $131.17 |
| 2018 | 61.3% | $160.73 |
| 2017 | -- | -- |
| 2016 | -- | -- |
| 2015 | -- | -- |

215.   The following graphs display the same data in the tables directly above. The first shows each Casino-Hotel Defendant's occupancy levels, and the second shows each one's room rates:





216.    The data displayed in the two paragraphs above show meaningful trends across Casino-Hotel Defendants that corroborate the observations gleaned from the market-wide numbers discussed above. During the class period—except for the outlier year of 2020—Casino-Hotel Defendants' room rates trended upward and in similar proportion while the occupancy rates for all but one meaningfully decreased. This parallel conduct is significant in and of itself.

217.    Furthermore, one would expect to see greater volatility within each Casino-Hotel Defendant's room rates and occupancy levels during the class period in a competitive market than what this data shows. Economic principles should have compelled at least some Casino-Hotel Defendants to drop room rates to raise their occupancy rates during this period, which would have resulted in less upward pricing volatility and higher occupancy rates across operators. Not only would this have still allowed them to obtain higher room revenue than before, it also would have allowed

them to generate greater casino revenue from the additional guests who would have stayed at their hotels rather than their competitors' as a result. But this did not happen.

218.    Also noteworthy is the fact that one Casino-Hotel Defendant, Hard Rock Atlantic City, increased its occupancy levels in contrast to the others while nonetheless raising its room rates in similar proportion to the others. Competitors in a normally functioning market would not be expected to sit by and let one company take market share at these rates. Instead, rational actors would have undercut Hard Rock Atlantic City on pricing and increase their respective occupancy rates, thus forcing it to do the same and return to its prior position. But Hard Rock executed this strategy over multiple years, and no other Casino-Hotel Defendant reacted in a way one would expect rational firms to behave under such circumstances.

219.    In compliance with the admonitions from Rainmaker and Cendyn personnel, Casino-Hotel Defendants exercised "discipline" and averted the "inevitable race to the bottom" on price that is "inevitable" in competitive markets. They were thus able to charge higher room rates, and obtain higher room corresponding revenue, than would have been possible absent the conspiracy. The fact that Hard Rock Atlantic City's slight deviation on occupancy levels did not start a price war further reveal Casino-Hotel Defendants' market power and the cartel's efficacy. Stated in economic terms, the cartel's benefits far exceeded the discounted present value of future profits to be achieved from undercutting price—even if others did not follow.

220.    True to advertising, the Rainmaker pricing algorithm platform has delivered for Casino-Hotel Defendants. Through GuestREV, the individual room rate tool, Casino-Hotel Defendants increased their revenues by "up to 12%." Through GroupREV, the group room rate tool, Casino-Hotel Defendants "improve[d] Group Room Revenue by up to 8.4% or more." And through REVCaster, Casino-Hotel Defendants used the unparalleled visibility into each other's current rates to further adhere to the algorithm's "optimal" room rates while monitoring one another's pricing.

221.     Casino-Hotel Defendants' knowing shared use of the Rainmaker pricing algorithm products to set optimal room rates, with the coordination and support of Cendyn, has produced anticompetitive effects in the Atlantic City Casino-Hotel Market by causing class members to pay artificially inflated prices for rooms rented directly from Casino-Hotel Defendants.

**F.    Defendants' Conduct Has No Pro-Competitive Benefits.**

222.     Defendants' collective room pricing scheme has neither benefitted competition nor produced pro-competitive effects in the Atlantic City Casino-Hotel Market.

223.     While Defendants' misconduct has benefitted Defendants by increasing their own revenues and profits, it has had the opposite impact on both consumers who have subsidized this windfall by paying artificially inflated prices as well as the competitive process more generally.

224.     While Defendants' misconduct has increased Defendants' operational efficiencies by saving them time, labor costs, and other resources, it has made it more difficult and time-consuming for consumers to identify and secure meaningfully cheaper rates for comparable rooms offered by their co-conspirators.

225.     Assuming any pro-competitive benefits from Defendants' misconduct exist (they do not), they would be *de minimis* in nature and could not outweigh the significant and ongoing anticompetitive effects that it has caused in the market.

**G.    Economists, Academics and Regulators Recognize This Conduct Produces Anticompetitive Effects.**

226.     Legal scholars, antitrust regulators, and economists studying the issue have all concluded that competitors' use of a shared pricing algorithm to set prices produces the same type of anticompetitive effects that have occurred in the Atlantic City Casino-Hotel Market.

227.     Competition law professors Ariel Ezrachi and Maurice Stucke have written extensively on the subject. In their May 2017 paper titled *Algorithmic Collusion: Problems and Counter-Measures*, they

discussed "how in an online environment a hub-and-spoke [price-fixing conspiracy] framework may emerge when sellers use the same algorithm or the same data pool to determine price." In particular:

> *An industry-wide use of a single algorithm, which competitors use to determine the market price or react to market changes, would result in de-facto hub-and-spoke structure, as the market behavior of the competitors aligns due to the use of a similar "brain" to determine their price strategy.* These effects intensify when sellers use the same data pool and are privy to vast volumes of data. Hub-and spoke structures may therefore be observed at the input level (data) and the output level (algorithm).

228. The law professors went on to note this situation playing out in connection with gas stations using the same third-party analytics provider to determine fuel prices. The professors concluded that "[t]his anecdotal example supports the assertion that *as competitors use a single hub – a single provider for algorithmic pricing – one may expect, in markets susceptible to tacit collusion, greater alignment of pricing decisions and higher prices overall*."

229. Federal regulators similarly have sounded the alarm. In 2017, Maureen Ohlhausen, the then-acting Chair of the Federal Trade Commission, discussed why multiple competitors who use the same third-party firm to set prices is just as anticompetitive as a prototypical price-fixing conspiracy:

> What if algorithms are not used in such a clearly illegal way, but instead effectively become a clearing house for confidential pricing information? *Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates its pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy information from multiple competitors, it can program its algorithm to maximize industry-wide pricing.* In effect, the firms themselves don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market-wide prices. Again, *this is fairly familiar territory for antitrust lawyers, and we even have an old-fashioned term for it, the hub-and-spoke conspiracy. Just as the antitrust laws do not allow competitors to exchange competitively sensitive information directly in an effort to stabilize or control industry pricing, they also prohibit using an intermediary to facilitate the exchange of confidential business*

***information.*** Let's just change the terms of the hypothetical slightly to understand why. Everywhere the word 'algorithm' appears, please just insert the words 'a guy named Bob.' Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? ***If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either***.

230.　Economists who have studied competitors' use of shared pricing algorithms in concentrated markets to set pricing confirm the anti-competitive effects that this conduct produces in general and that has occurred here in particular.

231.　In a March 2021 paper titled *Autonomous Algorithmic Collusion: Economic Research and Policy Implications*, a team of economists studied the impact that using pricing algorithms could have on competition. In doing so, they addressed the anticompetitive consequences of competitors using the same third-party algorithm to set prices:

> ***Algorithmic pricing can also affect competition if a single intermediary software provider sells their product to multiple competitors.*** Such adoption could lead to hub-and-spoke (where the provider acts as the hub of the sellers, Ezrachi and Stucke 2015) or parallel-use scenarios, with competitors coordinating to higher prices by delegating choices or relaying information to the same third party. ***These concerns are warranted by the statements and observed behaviour of software providers. Some providers promote their products by suggesting that they optimize for long-term revenues and avoid price wars***.

The conduct attributed to the software providers—encouraging competitors to use their algorithms to "optimize" revenue and avoid undercutting each other on price—is what Cendyn has successfully promoted and enabled Casino-Hotel Defendants to do. It also is conduct frequently observed in traditional horizontal price-fixing conspiracies.

232.　A March 28, 2023 paper titled *Coordinated vs. Efficient Pricing: The Impact of Algorithmic Pricing on Multifamily Rental Market* by two professors at the University of Pennsylvania's Wharton School of Business examined the impact of algorithmic pricing on the U.S. multifamily rental housing market from 2005 to 2019, with a focus on RealPage's apartment unit pricing algorithm software.

69

233.     In the paper, economist Sophie Calder-Wang and computer scientist Gi Heung Kim began by discussing how this software—which functions in virtually the same way as the Rainmaker pricing algorithm platform at issue here—works. The professors "were able to obtain a copy of presentation slides made in 2014 that showcases the inner workings of one of the software, RealPage's YieldStar," and reported what they observed:

> **The most notable point is that the software estimates demand elasticity and forecasts dynamic demand at the bedroom-level** based on lease length and renewal probability **by fully utilizing selected competitors' prices and vacancies**…. [The interface] shows the dashboard views for a property manager that displays price recommendations made by the software. All of this information is purely for providing data points to manager and the cognitive burden for a manager to act on this myriad of information is minimal; a manager can simply click either the 'Accept Rates' or the 'Review Rates' (if something seems so out of place) button located on both top and bottom of the table. ProPublica reports that managers accept recommended rents up to 90% of the time.
>
> **The pricing software both reacts to changes in market conditions and heavily utilizes the detailed, high-frequency data of competitors down to the granularity of daily prices for individual units**. The question is then, where do they get the data from?…. [I]is almost certain that **Yieldstar utilizes its own clients' data to maximize other clients' profits**[.]

234.     After conducting an empirical analysis of the relevant data, the economists presented several findings on the effects of algorithmic pricing software adoptions on apartment rents:

- *First*, the algorithm's "adopters exhibit a more responsive pricing function to the changes in local demand conditions," resulting in **higher rents and lower occupancy levels "during the boom" periods**.

- *Second*, **"across markets, higher levels of penetration" of algorithm use "lead to higher rents,"** a "pattern" that "is robust across time-periods, market definitions, and regression specifications." While they found this to be true for algorithm adopters, they

also found this to be the case market-wide, including for non-adopters, where the adopters had sufficiently high market share.

- *Third*, the observed impacts can "be **consistent with the pattern of coordinated pricing**, shown by the empirical pattern of price increase and quantity restriction of the non-adopters as well as the previous theoretical and empirical work on algorithmic pricing."

235.     Landlords' increasing use of RealPage in certain markets to set pricing and the resulting rise in rents parallels what has happened in the Atlantic City Casino-Hotel Market. While firms in each industry have used the respective Rainmaker-developed pricing algorithm for numerous years, the resulting anticompetitive effects in each industry have occurred in certain markets more recently, during periods of relative economic prosperity and when colluding competitors have possessed sufficient market power. Further, this conduct has increased prices market-wide, not just those of the participating firms.

236.     Defendants' coordinated pricing conduct through Casino-Hotel Defendants' shared use of the same pricing algorithm platform has produced the same type of anticompetitive effects as a traditional hub-and-spoke price-fixing conspiracy.

**H.   This Market Has Characteristics That Make It Susceptible to the Effective Collusion That Has Occurred.**

237.     The Atlantic City Casino-Hotel Market possesses multiple factual enhancements or "plus factors" that, when considered with Casino-Hotel Defendants' consciously parallel pricing and supply conduct described above, render it susceptible to collusion and thus make the formation, maintenance, and efficacy of a cartel more likely.

238.     The Atlantic City Casino-Hotel Market is characterized by at least the following "plus factors:" (1) motive to conspire; (2) actions against interest; and (3) traditional conspiracy evidence.

## 1. Defendants Had the Motive to Conspire.

239. Defendants had the motive to conspire given the structural features of the market and the financial difficulties Casino-Hotel Defendants faced in the years preceding the class period.

240. **Structural Features.** The Atlantic City Casino-Hotel Market possesses structural characteristics that are common in industries plagued by collusion: (a) high entry barriers; (b) high market concentration; (c) lack of reasonable substitutes; and (d) product fungibility.

241. <u>High Entry Barriers</u>. Prospective entrants to the Atlantic City Casino-Hotel Market face significant barriers. The most prohibitive one is the enormous amount of money and resources it takes to open and maintain such a property. Capital expenditures exceeding a billion dollars are needed to acquire land and build a modern casino-hotel resort with the necessary amenities to compete for guests, and entrants acquiring an existing resort still need to spend hundreds of millions in dollars in renovations and rebranding before re-opening the venue.

242. The large amount of capital needed to build and operate a casino-hotel in the Atlantic City Casino-Hotel Market is demonstrated by real-life examples, including the following:

- It cost $1.2 billion more than 30 years ago to build Trump Taj Majal, which Hard Rock International acquired and spent more than $500 million renovating before re-opening as Hard Rock Atlantic City in 2018.

- MGM Resorts spent $1.1 billion to build Borgata in 2003 and another $400 million to build the Water Club at Borgata in 2008.

- Caesars Entertainment announced in 2022 that it would spend $200 million in property enhancements at Caesars Atlantic City and another $200 million in improvements at Harrah's Atlantic City and Tropicana Atlantic City.

243. A large sum of money is not the only significant barrier to entering the market that prospective entrants face. Before opening, entrants must pass a rigorous governmental approval

process and receive authorization from New Jersey's Casino Control Commission. The Commission licenses all casinos in the state, and it also rules on the qualifications of persons and entities. According to the Commission's 2018 Annual Report, "[a]pplicants must establish, among other things, their financial stability, integrity, responsibility, business ability and experience necessary to establish and maintain a successful, efficient casino operation."

244.    Once open, casino-hotels face substantial ongoing costs, including maintaining a property management infrastructure, paying large workforces (some of which are unionized) that staff the properties, and paying high taxes to local, state, and federal governments.

245.    <u>High Market Concentration</u>. The Atlantic City Casino-Hotel Market is highly concentrated, with Casino-Hotel Defendants collectively possessing a dominant share of the market during the class period.

246.    The three corporate parent Casino-Hotel Defendants and their Atlantic City casino-Casino-Hotel Defendants have owned and operated between five and six (depending on timeframe) out of nine casino-hotels in the market. Moreover, and most importantly, Casino-Hotel Defendants and their co-conspirators have possessed between 72% and 80% of the total guest rooms available for occupancy in this market.

247.    <u>Lack of Reasonable Substitutes</u>. No reasonable substitutes are available to consumers in the Atlantic City Casino-Hotel Market, thus making the demand for guest rooms in Atlantic City casino-hotels relatively inelastic. Inelastic demand means that when the price for a product or service increases, consumers' buying habits stay about the same, and when the price for a product or service decreases, consumers' buying habits also remain relatively unchanged. Here, casino-hotel guests in Atlantic City have limited, if any, low-cost alternatives to renting rooms from Casino-Hotel Defendants or other casino-hotels due to the unique product offering that casino-hotels there provide. Consequently, this enables Casino-Hotel Defendants to impose small yet significant non-transitory

increases (of 5% for at least one year) in room prices without losing a meaningfully number of guests to other types of lodging. Consequently, no reasonable substitutes exist to effectively discipline Casino-Hotel Defendants' conspiracy.

248.   <u>Product Fungibility</u>. Rooms that Atlantic City casino-hotels offer for rent are relatively interchangeable with each other. When controlling for key room characteristics across casino-hotels like size and amenities, the relevant product is relatively fungible. Guests choose to stay at casino-hotels that provide comparable offerings within these general categories. For example, a couple seeking to rent a large room with a king-size bed who like to play blackjack, dine at an upscale restaurant, and attend a show can stay at any of the casino-hotels in Atlantic City, but nowhere else.

249.   **Incentive to Collude.** Casino-Hotel Defendants experienced an extended period of financial hardship in the years leading up to the class period that incentivized them to conspire.

250.   The Atlantic City Casino-Hotel Market's economic downturn coincided with, and to a large extent was caused by, the Great Recession. The sub-prime mortgage crisis plunged the U.S. economy into a full-blown recession from late 2007 through 2010, and the country's GDP did not return to pre-recession levels until around 2012.

251.   Atlantic City's casino-hotels suffered a substantial downturn in visitors and revenue during this period. From 2007 to 2009, the city had the second largest drop in gross gaming revenue of all casino markets. According to Professors Youn's and Gu's 2010 *Journal of Hospitality Financial Management* study and a January 2010 *Press of Atlantic City* article, 2009 represented the third straight year of declining revenue for Atlantic City casino-hotels. Every property reported a decrease in revenue that year compared to the prior year, including Caesars Atlantic City (-23%), Tropicana Atlantic City (-10%), Harrah's Atlantic City (-4%), Bally's Atlantic City (-15%), and Borgata (-8%). The city's overall casino revenue was down 13% from the prior year.

252.     The subsequent years saw no material improvement for the Atlantic City casino-hotel industry due to properties' high debt levels and depressed cash flows from the recession's peak.

253.     In 2014 alone, four casino-hotels closed: Revel Atlantic City; Atlantic Club Casino Hotel; Trump Plaza Hotel and Casino; and Caesars Entertainment-owned Showboat Atlantic City.

254.     In a June 2014 news release, Caesars Entertainment announced that it would close Showboat due to "persistent declines in business levels in the area." Then-CEO Gary Loveman explained that "we believe this is a necessary step to help stabilize our business in Atlantic City and support the viability of our remaining operations in the vicinity."

255.     Caesars Entertainment's operating subsidiary, moreover, filed for bankruptcy in 2015. According to a January 16, 2015 article in *The Motley Fool*, the Great Recession marked the start of the company's problems. While "Caesars did manage to survive the recession with the help of extensive financial maneuvering and in 2012 completed a public offering of shares," it could not avoid filing for bankruptcy because "over $20 billion in debt still hung over the company and losses grew year after year." "What's interesting," the article added, "is that Las Vegas didn't drive the decline in Caesars' fortunes. It was actually regional gaming in places like Atlantic City[.]"

256.     After enduring years of financial strain and coming close to shuttering in 2014, Trump Taj Mahal ultimately filed for bankruptcy and ceased operations in late 2016.

257.     Atlantic City casino-hotels' collective total revenue remained essentially flat between 2014 and 2017. While 2017 revenue very slightly increased compared to 2016, that was driven by slightly higher gaming revenue, as hotel room revenue took a step back that year.

258.     As 2018 approached, Casino-Hotel Defendants had experienced a prolonged period of financial hardship and were eager to change course. While most already were using the Rainmaker pricing algorithm products by that time, there was only so much they could do in the face of such strong and sustained economic headwinds. But once these winds started to shift and a new entrant

75

joined the scheme, their collective use of the platform truly began to produce the desired results in a sustained fashion.

259.     Hard Rock Atlantic City opened on June 28, 2018. On or around that date, it knowingly joined the other Casino-Hotel Defendants in using the shared pricing algorithm platform, with the active coordination and support of Rainmaker. With Hard Rock Atlantic City's entry into market and the anticompetitive scheme, moreover, Casino-Hotel Defendants' market share rose to 80%.

260.     On or around this date, Casino-Hotel Defendants had the financial motive, market power and economic tailwinds to take full advantage of the Rainmaker pricing algorithm platform and achieve the kind of significant revenue increases that Cendyn had promised.

### 2.     Defendants Acted Against Their Independent Self-Interests.

261.     By raising room prices in virtual lockstep with the Rainmaker pricing algorithms' recommendations, Casino-Hotel Defendants and their co-conspirators took actions that would have been against their individual economic self-interests in the absence of coordination.

262.     Fundamental principles of economics, which Casino-Hotel Defendants abandoned in pricing their rooms once the class period started, support this conclusion. If only a minority of Casino-Hotel Defendant properties, say one or two, would have used Rainmaker's pricing algorithms and thus charged commensurately higher room prices in Atlantic City in the but-for world, then the critical mass of non-Rainmaker casino-hotels who continued to set their prices independently would have undercut the Rainmaker properties on room rates, filled a proportionately higher share of their rooms, and received greater overall revenue than the Rainmaker-affiliated competitors. This is how the market would have worked during the class period but for Defendants' conspiracy.

263.     The likelihood of such a pro-competitive outcome occurring in the absence of Defendants' misconduct is even higher than usual due to the unique business model of casino-hotels.

Not only would the competing casino-hotels have received more income from the rental of their rooms, but they also would have obtained a proportionally greater amount of revenue from their casinos due to the additional guests staying at their hotels.

264.    Additionally, there are no market factors, like rising costs or increased demand, that sufficiently can explain the kind of increase in room rates and corresponding revenue that Casino-Hotel Defendants each have obtained during the class period.

### 3.    Multiple Forms of Traditional Conspiracy Evidence Exist.

265.    Finally, numerous categories of facts exist tending to show collusion: (a) a radical change in business practices by the conspirators; (b) the conspirators' adoption of a common course of action; (c) opportunities for the conspirators to conspire; (d) exchange of competitively sensitive information among conspirators; and (e) a pending governmental investigation into highly similar and related conduct.

266.    **Change in Business Practice.** Casino-Hotel Defendants' shared use of the Rainmaker pricing algorithm products to price hotel rooms, with the encouragement and assistance of Cendyn, especially after obtaining market power, represents a stark change from how they independently priced rooms for years beforehand.

267.    Because gambling has always been the main revenue driver and profit center for casino-hotels, they long have used their hotels to draw guests to their casinos. To entice as many guests as possible to stay in their rooms instead of their competitors' rooms, casino-hotels traditionally have offered significantly reduced room rates across customers. This is because more hotel guests equal more gambling revenue. The Atlantic City Casino-Hotel Market was no exception.

268.    Defendants' anticompetitive conduct—collectively using a single pricing algorithm platform to "optimize" each property's room rates while preventing guest "rate shopping" and leaving

77

a significant proportion of rooms vacant—has turned the industry's well-established business model on its head.

269.     By adopting this radical new pricing approach, moreover, Casino-Hotel Defendants eliminated a major competitive tool. They risked that any single Casino-Hotel Defendant would either continue to offer cheaper room rates or substantially cheat after joining the conspiracy by cutting rates to increase occupancy rates. Either outcome would render the conspiracy ineffective. The most reasonable explanation for this turn of events and resulting impact on the market is collusion.

270.     **Common Course of Conduct.** Defendants adopted a common course of conduct in which Casino-Hotel Defendants all used the same pricing algorithm platform from the same company to set their room rates during the class period.

271.     Casino-Hotel Defendants knew that they each were doing the same thing too. Rainmaker and Cendyn made it known within the industry that each Casino-Hotel Defendant used Rainmaker pricing algorithm products during the class period. Rainmaker and Cendyn did so with their own marketing materials and in industry publications that Casino-Hotel Defendants read and during industry and customer events that Casino-Hotel Defendants attended. Certain Casino-Hotel Defendants also openly touted their use of the Rainmaker pricing algorithms through customer testimonials that Rainmaker and Cendyn would then use to market to other casino-hotels.

272.     Furthermore, Casino-Hotel Defendants knew that their shared use of the same pricing algorithm was effective. They all have had access to and reviewed each other's regular financial filings with the Division of Gaming Enforcement as well as the Division's monthly and quarterly reports summarizing the data contained in these filings. Similarly, they have had access to and reviewed the Casino Control Commission's annual report on the industry. All of these filings and reports contain information on individual competitors' room rates, occupancy levels, and revenues that Casino-Hotel Defendants could and did piece together with little effort to conclude their scheme was working.

273.     **Opportunities to Conspire.** Defendants had ample opportunity to collude during the class period. Defendants' key employees attended various industry conferences where the use of Rainmaker pricing algorithm products was discussed. Rainmaker and Cendyn discussed pricing strategies and revenue practices with individual Casino-Hotel Defendants. Finally, Casino-Hotel Defendants' Atlantic City resorts are all members of the city's casino trade association, where issues of common concern impacting finances and profitability are discussed outside of public view.

274.     Defendants regularly attended industry events where topics regarding revenue management, including the Rainmaker platform, were discussed. These events include Rainmaker's annual user conference, Gaming & Leisure Roundtable events, HSMAI Revenue Optimization Conference, INFORMS Business Analytics Conference, and BITAC Casino Resorts Conference.

275.     Rainmaker hosted "annual user conferences," called "Hospitality Client Summits," from 2004 to 2019 where "feedback" from its casino-hotel clients was "really solicited," according to a senior revenue manager from an MGM Resorts-owned casino-hotel. The manager added that "the opportunity to help guide a roadmap for their system is really great."

276.     Rainmaker held its 2015 summit in Fort Lauderdale, Florida. According to a March 2015 Rainmaker release posted in trade publication *HospitalityNet*, the conference was:

> **highlighted by The Rainmaker Group's latest innovative advancements to solve the key business challenges that help hotels optimize profitability through its unique total revenue management methodology**…. Rainmaker also introduced cutting-edge enhancements to its market-leading GuestREV and GroupREV solutions, and further deployment news of its recent acquisition of Revcaster and its hospitality market intelligence and analytics solution. **A record number of traditional and casino-hotel customers attended to participate in education sessions covering common unsolved problems to improve their business results, and to network with industry peers**.

277.     The Rainmaker release also provided commentary on the conference from attendee Pavan Kapur, Caesars Entertainment's then-Vice President of Revenue Management and current

Senior Vice President of Commercial Operations. Said Kapur: "***Being in the room with colleagues and like-minded individuals with varying degrees of revenue management experience and who have similar goals and challenges was a great experience.***" He also noted that "***[t]he Rainmaker team is a great partner who supports and helps us achieve our goals through the kind of investment and innovation we saw this week***," while adding that he "was particularly impressed with GroupREV[.]"

278.   Rainmaker's 2016 Summit, titled "OPTIMIZE2016," was held at Miami's Trump Doral Resort on February 17-19, 2016. It "convened more than 300 people for three days of substantive sessions addressing the state of the industry and solutions that move beyond revenue management to profit optimization." According to an early March 2016 article, "OPTIMIZE2016 delivered a lively debate between Rainmaker co-founders Bruce Barfield and Tammy rev on macro-economic trends" and "***town hall-style meetings that offered visitors a walk-through of Rainmaker products***." "OPTIMIZE2016 was our most ambitious and well-attended conference yet," said Farley. "***We did our utmost to share insights and changes to our technology, but we also wanted to give our attendees broader context for the work they do day-to-day***[.]"

279.   Cendyn's website features customer testimonials of several users who attended Rainmaker's 2019 Summit about "their experience with using Rainmaker's Guestrev." These customers raved about the success they had with the product, with one stating that "15 month[s] after our implementation, we've seen revenue increases upwards of 6 percent," another stating that "we definitely saw a good 5 to 10 percent revenue increase, especially over our peak months," and another noting that "we were able to improve our rate and our profitability year over year."

280.   Gaming & Leisure ("G&L") Roundtable is an invitation-only organization comprised of high-level decisionmakers in the casino-hotel industry and certain vendors. According to the organization: "Each year the G&L Roundtable hosts a vast majority of gaming and hospitality

domestic spend and . . . has hosted the most gaming CIOs [Chief Information Officers] in one private forum in North America." This annual "***private invitation-only***" event is, according to the organization, "one of the most sought-after offerings" because it "***shapes the gaming and hospitality industry landscape each year by bringing together in one forum the very people who can foster change and innovation*** as comprised on the G&L Board and their invited Colleagues." This "open and enjoyable two-day forum" allows "***industry thought leaders to collaborate, learn, and share best practices while meeting new peers and solidifying old friendships***."

281.    The following G&L Roundtable advertisement from an industry publication boasts that it is the "Top Private Industry Forum in North America" due to various benefits—like "shar[ing] best practices," "leverag[ing] knowledge," "and "maintain[ing] connections throughout the year"— it offers to "gaming" executives, including those from Casino-Hotel Defendants, who attend:



282.   Defendants' high-ranking employees regularly attend G&L Roundtable's annual conference as well as its periodic golf outings. Before Cendyn acquired Rainmaker in 2019, Rainmaker's Farley and Barfield served as "Partner Co-Hosts of the Roundtable" and ran the organization's golf invitational for "many years." A set of photographs from that outing, with Farley and Barfield highlighted, follow:



283.    Cendyn's acquisition of Rainmaker did not end the new company's involvement in the G&L Roundtable. G&L Roundtable's leader informed members of the acquisition: "As most now know, **Cendyn has acquired Rainmaker, and we very much look forward to working with Cendyn** in 2020." The leader also "**acknowledge[d] all that Rainmaker has done in elevating our industry and the G&L Community**" before wishing "Tammy and Bruce" well in "all their future endeavors."

284.    Cendyn did not miss a beat following the acquisition. Its key personnel regularly attended G&L Roundtable events. For example, Senior Vice President for Commercial-Customer Relationship Management Robert Magliozzi and Vice President of Enterprise Sales for Gaming and Casinos Angie Dobney attended various G&L Roundtable-sponsored golf outings. A photograph taken from the 2019 G&L Golf Invitational that they attended, and in which they are highlighted, follows:



Winning Team presented by Bob and Angie to Scott, Nick, Pat, and Brian.

285.    Casino-Hotel Defendants' management-level employees also attend G&L Roundtable events. Attendees at the annual conference have included management personnel with responsibilities related to their companies' implementation and maintenance of the Rainmaker platform, including representatives from Caesars Entertainment, MGM Resorts, Hard Rock Atlantic City.

286.    In addition, executives from each Casino-Hotel Defendant group sit on Gaming & Leisure's Board of Directors, including Caesars Entertainment Senior Vice President of Information

Technology Peter Broughton, MGM Resorts Vice President of Operations Craig Jacobs and Corporate Information Technology Lead Product Manager Fran Moore, and Hard Rock Atlantic City Vice President of Information Technology Don Kneisel.

287.    Gaming & Leisure Board members also communicate privately during in-person gatherings including those noted above as well as through a "***private group for Gaming & Leisure Board Members only***" on LinkedIn. Gaming & Leisure CEO Jeannie Caruso "created this private, no cost, easy to navigate group for our Board ***so that you can communicate freely on questions, best practices, and strategy etc.***" This group, Caruso told board members, "is ***your private forum to work with peer G&L Board Members to garner insights and collaborate together***."

288.    The Gaming & Leisure Board Members LinkedIn group (found at https://www.linkedin.com/groups/12395008/) is comprised of "27 members" and contains the following screenshots:





289.    Defendants have attended the annual Hospitality Sales and Marketing Association International Revenue Optimization Conference ("HSMAI ROC") during the relevant period.

290.    "HSMAI's ROC is where hotel revenue leaders unite for education, collaboration and innovation at the world's largest gathering of revenue professionals in the travel industry," HSMAI noted ahead of the June 18-19, 2019 event.  "HSMAI's ROC has delivered the most compelling and comprehensive event for the hotel revenue optimization discipline," the trade association further noted. "**ROC convenes leaders of revenue optimization and pricing** . . . who want to learn new ways of thinking about today's challenges, and gain insights into the short- and long-term trends that will impact hotel revenue optimization."

291.    HSMAI further notes that "***[a]ttendees at ROC are responsible for leading revenue optimization and pricing***" at their properties. "ROC is also of interest to ***partner companies serving the revenue management industry***, including consultants, technology vendors and companies providing products and services in revenue management, execution, and reporting."

"With *powerful* educational and *networking opportunities*," HSMAI adds, "ROC is the can't-miss event of the year. It's where *senior leaders in hotel revenue optimization connect and engage in meaningful, inspiring conversations about the most critical strategic issues facing hotels today*."

292.    As Rainmaker's then-Vice President of Hotel Demand Generation Vikram Singh noted in a June 15, 2016 post on the company's Hospitality and Gaming Blog, "[e]very year, the Rainmaker hospitality and gaming team looks forward to attending the annual HSMAI ROC (Revenue Optimization Conference) event."

293.    Singh went on to discuss the features and benefits of this annual event in the post:

> Over the years, the HSMAI ROC event has become *the perfect platform for gaining insights and developing your own revenue management skills*, as well as those of your teams. In addition to that, it's one of the year's *best networking events for revenue optimization* newbies, ace practitioners, and philosophers alike. Rainmaker has successfully partnered with ROC for several years. This year is no different. *We're also contributing some exciting content to the program*…. The Revenue Optimization Conference (ROC) is going to be an *epicenter of education and collaboration. Our entire hospitality and gaming revenue management team is attending so we can be available to anyone who wants to meet. P*lease do not hesitate to reach out and set a time to speak with us!

294.    The 2016 HSMAI ROC, for example, occurred in New Orleans, Louisiana in late June. As Singh stated in the above-referenced post, "[r]evenue managers, stakeholders and optimizers from hotels of all shapes and sizes travel from all over the US and abroad to gather at this event. It's *so exciting for our industry* that I like to call it the *annual Revenue Management Nerd Prom*."

295.    Rainmaker's Tammy Farley and Dan Skodol were regular attendees at HSMAI ROCs. One of the numerous conferences Farley attended was the June 2018 event in Houston, Texas, themed "Take Revenue by the Horns," as memorialized in an online 2018 HSMAI ROC Recap video.

296.    Skodol similarly attended many of these conferences. Called Rainmaker's "very own Revenue Optimization rock star," Skodol led a session at the June 2016 conference. He also spoke at

the June 2019 HSMAI ROC in Minneapolis, Minnesota. In her August 14, 2019 "HSMAI ROC 2019 Conference Recap," Stephanie Smith thanked Skodol "for having the most actionable presentation[] at the conference!" Cendyn's then-Senior Vice President for Global Marketing & Business Development and current President and Chief Marketing Officer Michael Bennett also gave a presentation on data science at the conference according to the Recap.

297.    Following the 2019 acquisition of Rainmaker, Cendyn continued to have a formidable presence along with Casino-Hotel Defendants at the annual HSMAI ROC. For example, the 2022 conference, themed "Accelerate Recovery," was held in late June in Orlando, Florida. The following excerpts from the conference's attendance list show that various management personnel from Cendyn, Hard Rock International, and MGM Resorts attended:

**2022 HSMAI ROC – Orlando, FL**
Post-Conference Attendee List (as of July 7, 2022)

| | |
|---|---|
| Cendyn | Sr. Director, Strategic Product Initiatives |
| Cendyn | Key Account Director |
| Cendyn | Director of Sales, North East |
| Cendyn | Sr. Director Customer Experience |

| | |
|---|---|
| Hard Rock International | Hotel Distribution & Reservations Manager |

| | |
|---|---|
| MGM Resorts International | Vice President, Distribution |
| MGM Resorts International | Vice President of Revenue Management |
| MGM Resorts International | Executive Director Revenue Management |
| MGM Resorts International | Executive Director Revenue Management |

298.    Rainmaker and Cendyn have had prominent sponsorship roles at HSMAI events over the years. For instance, both companies were Platinum Partners for the 2019 HSMAI ROC held June 18-19, 2019 in Minneapolis, Minnesota. Cendyn continues to play a leading role in HSMAI; it is currently one of a handful of HSMAI "Global Organizational Members."

87

299.     Casino-Hotel Defendants' personnel also have sat on various HSMAI Boards. For example, Caesar Entertainment's Senior Vice President of Commercial Operations Pavan Kapur and MGM Resorts' Chief Sales Officer and Senior Vice President Stephanie Glanzer are current HSMAI Americas Board members. MGM Resorts' Executive Director of Revenue Optimization Michael Klein previously sat on HSMAI's Revenue Management Advisory Board.

300.     Defendants also have attended the INFORMS annual Business Analytics Conference. The 2017 conference, held at Las Vegas' Caesars Palace from April 2-4, was attended by "about 900 businesspeople" and featured "highlights" like "long-formatted talks" and "great networking!" Rainmaker's Farley was a keynote speaker. Rainmaker's (and later Cendyn's) Dobney hosted a "***strategic session***" on April 3 with the following stated agenda:

> Hotels can forecast each segment's demand, determine the optimal mix based on the profitability of each segment, and then make pricing decisions that target this ratio. In its session at INFORMS, Rainmaker will show them how to do this, step by step, in order to yield the best results.

Dobney ultimately "***present[ed] a step-by-step approach to total revenue optimization for casino and gaming properties***," "***detailing the data-driven methodology behind the total revenue management approach that has been successfully implemented by many casino properties in recent years***."

301.     BITAC's annual Casino Resorts Conference, attended by "C-Level executives from prominent gaming hotels," "serves to educate and ***strengthen relationships among casino property executives and leading industry suppliers***." BITAC states that its "event model employs a unique combination of engaging panels, pre-qualified and arranged meetings with decision-makers who are sourcing specific product, casual networking opportunities, relationship-building activities, and elegant drink and dining experiences."

302.     Rainmaker was "tapped to share expert insight on revenue optimization and guest loyalty with attendees at" the 2017 BITAC conference held August 27-29 at the Four Seasons Hotel in Toronto, Canada. As the press release noted, Rainmaker's Dobney was slated to participate "in an informative panel discussing how overall property profitability can be optimized without sacrificing service quality or negatively impacting the guest experience." Dabney added that "***BITAC Casino Resorts 2017 is a perfect opportunity to educate the industry on solutions*** that make it possible to fully analyze all revenue streams and provide the critical data necessary to fully leverage all of a property's assets*.*" Dobney again would:

> *share her extensive knowledge on how specific data-driven methodologies have been used successfully by casino properties in recent years to optimize revenue and profit, [and] draw on her experience at Rainmaker developing solutions designed to help the gaming industry overcome the challenges of revenue optimization strategy such as over-discounting and comping guestrooms*.

303.     In addition, as noted above, Cendyn had "tactical and strategic" discussions with individual Casino-Hotel Defendants about the pricing algorithm platform and profit optimization. As noted in one of its marketing brochures from 2019 discussed above, Rainmaker considered these discussions, which included topics like "shar[ing] industry best practices," to be "an integral part of every system implementation." Rainmaker also touted its "consulting services" to clients on issues like "pricing strategies" and "fine-tuning a new or existing revenue management program." Harrah's Entertainment (which became Caesars Entertainment) was one client that often had these "tactical and strategic" discussions with Rainmaker.

304.     Finally, the Atlantic City-based Casino-Hotel Defendants belong to and fund the city's casino-hotel trade association, The Casino Association of New Jersey ("CANJ"). Casino-Hotel Defendants' membership and control over this organization provides them with additional

opportunity to exchange competitively sensitive information and strategies and agree on common courses of anticompetitive conduct behind closed doors.

305.   "The Casino Association of New Jersey (CANJ)" website states that it "is a trade organization that provides a collective voice for the Atlantic City casino industry by facilitating the exchange of information and ideas between our industry, small businesses, Atlantic City stakeholders and the general public." As the *New Jersey Business Journal* more succinctly put it in an August 2022 article, "CANJ advocates for the Atlantic City casino industry."

306.   Soon after the first casino-hotel opened in Atlantic City in the 1970's, and before any others had obtained licenses to do so, "leading casino interests . . . formed a potentially powerful association that [would] speak with a unified voice on matters of mutual interest," the *New York Times* reported in July 1978. "Casino representatives, in a meeting at Resorts International Hotel last night, adopted the name the Atlantic City Casino Association, and a budget," the article noted. The group's first chair, William Weinberger, was President of Bally of New Jersey, Inc. Before that, he "was vice president of a similar organization in Las Vegas, Nev., when he was president of Caesars Palace Hotel there." The *Times* article added, "'The association runs Vegas,' said an Atlantic City hotel owner. Others expressed the belief that the new Atlantic City association may be powerful enough to do the same thing here."

307.   CANJ's membership consists of the city's nine casino-hotels, including each Atlantic-City-based Casino-Hotel Defendant.

308.   CANJ is funded by membership fees. According to the *New York Times* article, CANJ's first President "said a substantial membership fee was set at the [inaugural] meeting last night as a means of insuring that 'only the people actually developing casino hotels are included in the association, not any of the promoters.' He did not say what the fee was."

309.    CANJ, furthermore, is housed at one of its Casino-Hotel Defendant member's properties. According to the Chamber of Commerce of Southern New Jersey, the organization's address is "c/o Caesars Atlantic City, 2100 Pacific Avenue, Atlantic City, NJ 08401."

310.    CANJ's membership elects its President from the pool of leaders representing its member casino-hotels. Past Presidents of the group include Hard Rock Atlantic City President Joe Lupo, Caesars Entertainment Regional Presidents Kevin Ortzman and Steve Callender, and Borgata Vice President Joseph Corbo.

311.    While no publicly available agendas or meeting minutes exist to reveal the dates, locations, attendees, or discussion topics of any CANJ meeting, CANJ's members have discussed and commented on issues of common concern like revenue trends and totals, as its own "Media Releases" demonstrate. For example, CANJ's January 17, 2023 Media Release "reacted to the December 2022 Division of Gaming Enforcement (DGE) gaming revenue results report, which showed that 2022 was a year of rebuilding and recovery for the Atlantic City casino industry." In its December 17, 2021 Media Release, CANJ provided a "statement regarding the November 2021 Gaming Results" that discussed total casino-hotel revenue for that month and compared to the same month from an earlier year, while advocating for the passage of proposed tax legislation that would significantly reduce its members' tax payments. And in its January 14, 2022 Media Release, CANJ "announced today that Atlantic City saw a year of modest growth," and then discussed "the December 2021 Division of Gaming Enforcement (DGE) gaming revenue results report," noting and comparing total casino-hotel revenue for that year compared to 2019.

312.    **Information Exchange**. Cendyn encouraged and enabled the exchange of competitively sensitive business information and strategies among horizontal competitors in the same market through their shared use of the same third-party pricing algorithm platform and through its

communication of these competitors' respective pricing practices and strategies to each other through one-on-one consulting services.

313.    Casino-Hotel Defendants submit their current pricing and supply data to a common pricing algorithm, or hub, which uses this data along with other pieces of information to derive true market demand and recommend optimal pricing to each Casino-Hotel Defendant in that market. This conduct, at a minimum, constitutes improper information sharing among competitors that does not benefit class members.

314.    In addition, during numerous industry conferences, some of which are discussed above, Cendyn led discussions involving hotel industry executives and managers, including personnel from Casino-Hotel Defendants, on the best practices for maximizing room revenue and profitability while avoiding price wars, including through use of the Rainmaker pricing algorithm platform.

315.    Cendyn also provided consulting services to its hospitality industry clients, including Casino-Hotel Defendants, in connection with the initial set-up of the pricing algorithm software on their systems and on a prospective basis. During these private and recurring meetings, some of which are discussed above, Cendyn relayed and discussed with the specific Casino-Hotel Defendant information on current best practices and pricing strategies it was observing and promoting in the market. It is certainly stands to reason that Cendyn based its observations in whole or in part on communications its personnel had around the same time with other Casino-Hotel Defendants.

316.    This information exchange has caused Casino-Hotel Defendants' room rates to be artificially high during the class period yet has not improved competition or consumer welfare.

317.    Defendants' exchange of competitively sensitive information is anticompetitive, and thus serves as another category of evidence demonstrating collusion.

318.    **Related Government Investigation.** Finally, federal antitrust regulators reportedly are investigating virtually identical conduct in a related industry involving high similar pricing algorithms that Rainmaker developed and sold.

319.    A November 23, 2022 article from non-profit investigative news outfit *ProPublica* reported this development:

> The Department of Justice's Antitrust Division has opened an investigation into whether rent-setting software made by a Texas-based real estate tech company is facilitating collusion among landlords, according to a source with knowledge of the matter. The inquiry is being launched as questions have arisen about a 2017 merger between RealPage and its largest pricing competitor.

320.    The DOJ investigation, the article further noted, followed recent letters from Congressional leaders to antitrust regulators the previous month. The letters "raised concerns that RealPage's pricing software could be pushing rents above competitive levels and allowing big landlords to coordinate their pricing in violation of federal antitrust laws." One letter, penned by Senator Amy Klobuchar, who chairs the Senate Subcommittee on Competition Policy, Antitrust and Consumer Rights, relayed the "concern[] that the use of this rate setting software essentially amounts to a cartel to artificially inflate rental rates in multifamily residential buildings."

321.    The *ProPublica* article, which followed its initial October 15, 2022 piece on large property managers' use of RealPage and the impact on rents in some markets, noted that RealPage's pricing algorithm "software works by collecting information from property managers who are the company's clients, including what rents they are able to charge tenants." The article continued, "That information is fed into an algorithm that then recommends prices daily for each available apartment." The article added that "some experts have said using private data from competitors to set rents could run afoul of antitrust laws, allowing property managers to illegally coordinate their pricing."

322.    *ProPublica* then discussed how Rainmaker was directly featured in the matter, noting RealPage's 2017 acquisition of "its biggest competitor, a company called Rainmaker Group, which

made rent-setting software known as LRO, or Lease Rent Options." Although the DOJ investigated the transaction when it was announced, the focus was "limited" in scope and duration, according to a DOJ source. While "some career DOJ staff members were concerned about the merger, political appointees leading the agency at the time under Trump chose not to challenge it in court," according to the source.

323.     Importantly, the source added that "RealPage did not have the same reach then as it does today." *ProPublica*'s investigation uncovered that landlords using RealPage's algorithm have obtained high shares in some markets, like those with a 70% market share in one Seattle neighborhood, that have coincided with their ability to impose significant price increases.

324.     RealPage's apartment pricing algorithm platform operates in the essentially same way as Cendyn's hotel pricing algorithm platform. This should not be surprising: Rainmaker developed and marketed its highly similar apartment and hotel pricing algorithms before selling off each one in relatively close succession to its respective competitors. Indeed, as Rainmaker's Farley noted in an interview published by the *Atlanta Business Chronicle*, the underlying Rainmaker algorithm "**applies to any industry that has perishable inventory and data that you can access about supply and demand so you can optimize profit**."

325.     The DOJ's pending investigation into pricing collusion is premised on the same type of anticompetitive conduct centered on and caused by the same use of a highly similar pricing algorithm involving the same company at issue here. This investigation constitutes yet additional evidence supporting the inference of an antitrust violation here.

## V.     FRAUDULENT CONCEALMENT AND TOLLING

326.     Plaintiffs and the other members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. They did not discover, nor could have discovered through the exercise of reasonable diligence, the existence of Defendants' conspiracy until shortly before filing this Complaint.

327.     Defendants engaged in a secret and inherently self-concealing conspiracy that did not reveal facts sufficient to put Plaintiffs and the other Class members on inquiry notice.

328.     Defendants intentionally conducted their anticompetitive scheme outside of public scrutiny. For example:

(a)   Casino-Hotel Defendants privately submitted their own pricing and supply data to Cendyn, and Cendyn in turn used its proprietary pricing algorithms, the details of which remain confidential, to privately recommend optimal room rates for Casino-Hotel Defendants to charge;

(b)   Defendants regularly attended invitation-only industry events, including ones Cendyn held and sponsored, where revenue management, pricing strategies, and best practices, in addition to use of the Rainmaker products, were discussed behind closed doors; and

(c)   Cendyn and individual Casino-Hotel Defendants had private communications and meetings to discuss revenue management, pricing strategies, best practices, and use of the Rainmaker products.

329.     Casino-Hotel Defendants intentionally hid from Plaintiffs and the other Class members that they set their room rates pursuant to a shared third-party pricing algorithm that utilized their own current pricing and supply data and solved the "problem" of guest price-shopping.

330.     Casino-Hotel Defendants also affirmatively misrepresented to guests, through omissions, half-truths, and misrepresentations, how they determined room rates.

331.     Casino-Hotel Defendants do not inform guests that the room prices they pay are based on "optimal" rate recommendations set by a third-party algorithm that they all use.

332.     Indeed, a Borgata revenue manager conceded, in discussing his property's use of GuestREV to set room rates, that "**guests who use the hotel's website to book a stay see only the optimized recommended rate**" while "**[t]he mathematics behind the rate is imperceptible**."

333.     In addition, Casino-Hotel Defendants give guests the false and misleading impression that they receive the "best" and "lowest" rates and enjoy "competitive pricing" when they book rooms at any of their respective Atlantic City venues.

334.     On Caesars Entertainment's online booking platform, where guests can book stays at any of its Atlantic City resorts, the company promotes its "**Best Rate Guarantee**" and "**Lowest Rates.**" Even for the "Standard Rate" (*i.e.*, no promotions or discounts) Caesars lists for its rooms, it tells guests to "**Enjoy competitive pricing** on your stay in one of our great rooms." Similarly, Hard Rock Atlantic City's online booking platform provides its "**Best Available Rate**" for each room. And MGM Resorts' mobile online booking platform tells guests interested in booking a room at Borgata that it can be used to "**Book the lowest room rates**."

335.     Through Defendants' knowing and active concealment of their misconduct from their hotel guests, Plaintiffs and the other Class members did not receive information that should have put them, or any reasonable consumer standing in their shoes, on sufficient notice of potential collusion worthy of further investigation.

336.     The Atlantic City Casino-Hotel Market is not exempt from antitrust regulation. Indeed, the Federal Trade Commission and the New Jersey Gaming Commission each reviewed and ultimately approved the Caesars Entertainment-Eldorado Resorts merger. Plaintiffs and the other Class members thus reasonably assumed until shortly before the Complaint's filing that this market was behaving in a competitive manner.

337.    The earliest possible date on which Plaintiffs and the other Class members arguably could have been placed inquiry notice of Defendants' collusion would be October 15, 2022, the date of *ProPublica*'s first article discussing landlords' use of RealPage to set rents. The article, however, did not mention the parties or anticompetitive practices that are the subject of this lawsuit. And an ordinary person acting reasonably diligently would not have had the time, resources, or specialized training to uncover the misconduct that Plaintiffs, through counsel highly experienced in antitrust class action litigation, have alleged in this Complaint.

338.    Plaintiffs exercised reasonable diligence. Plaintiffs and the other members of the Class could not have discovered Defendants' alleged misconduct at an earlier date by the exercise of reasonable diligence because of the deceptive and secretive conduct taken by Defendants and their co-conspirators to conceal their misconduct.

339.    Due to Defendants' fraudulent concealment of their wrongful conduct, the running of the statute of limitations has been tolled and suspended with respect to the claims and rights of action of Plaintiffs and the other Class members as a result of the conspiracy, including all parts of the class earlier in time than the four years immediately preceding the date of this Complaint.

## VI.    CLASS ACTION ALLEGATIONS

340.    Plaintiffs brings this action on behalf of themselves and the following class ("Class") of all others similarly situated under Federal Rules of Civil Procedure 23(a) and 23(b)(3):

> All persons who have directly purchased a guest room for rent in Atlantic City, New Jersey, from one or more Casino-Hotel Defendants or co-conspirator casino-hotels, or from a division, subsidiary, predecessor, agent, or affiliate of such entity, from no later than June 28, 2018, until Defendants' unlawful conduct and its anticompetitive effects stop. Excluded from the class are federal and state governmental entities and judicial officers presiding over this case.

341.    The Class is so numerous that joinder of all members in this action is impracticable. There are tens if not hundreds of thousands of geographically dispersed Class members.

342.   The Class members, moreover, can be readily identified and notified in an administratively feasible manner using, among other information, the electronic transactional records of Casino-Hotel Defendants.

343.   Plaintiffs' claims are typical of those of the Class. Plaintiffs and all members of the Class claim that Defendants' alleged misconduct violates Section 1 of the Sherman Antitrust Act. Plaintiffs and all Class members also allege and will show that they were injured by the same anticompetitive and unlawful conduct that caused them to pay Casino-Hotel Defendants more for hotel rooms than they otherwise would have paid in the absence of their collusive conduct.

344.   Plaintiffs fairly and adequately will protect and represent the interests of Class members. The interests of Plaintiffs and Plaintiffs' counsel are fully aligned with, and not antagonistic to, the interests of the Class members. Plaintiffs are willing and able to dispatch the duties incumbent upon a class representative to protect the interests of all Class members. In addition, Plaintiffs' counsel have significant experience successfully prosecuting complex antitrust class actions and possesses the necessary resources to vigorously litigate the case to the greatest extent necessary for the Class.

345.   There are multiple questions of law and fact that are common to the Class and that the Class can prove with evidence common to all Class members, including the following ones:

    (a)   Whether Defendants formed an agreement, combination, conspiracy, or common understanding in which Casino-Hotel Defendants artificially raised prices or artificially suppressed the supply of hotel rooms in the Atlantic City Casino-Hotel Market;

    (b)   Whether Defendants' alleged misconduct constitutes a *per se* violation of Section 1 of the Sherman Antitrust Act;

    (c)   Whether Defendants' alleged misconduct, in the alternative, constitutes a violation of Section 1 of the Sherman Antitrust Act pursuant to a quick look analysis or a full-blown rule of reason analysis;

(d)   Whether Defendants' alleged misconduct in fact caused Class members to pay artificially high hotel room prices to Casino-Hotel Defendants in the Atlantic City Casino-Hotel Market;

(e)   The proper measure of Class-wide damages;

(f)   The scope and extent of injunctive relief needed to remedy the anticompetitive effects of Defendants' alleged conduct going forward; and

(g)   Whether Defendants fraudulently concealed the existence of the alleged conspiracy such that the statute of limitations is tolled.

346.   Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.

347.   Questions of law and fact common to the members of the Class will predominate over any individualized questions of law or fact. Defendants have acted and refused to act on grounds generally applicable to the Class.

348.   In cases like this one that allege price-fixing among competitors, including those with a hub-and-spoke component, the common question of law and fact regarding the existence of the alleged conspiracy by itself has been held to predominate over any possible individualized issues, thus warranting certification. The same holds true here.

349.   Class treatment is the superior method for the fair and efficient adjudication of this controversy. It will allow for the scores of Class members to prosecute their common claims, and for Defendants to defend themselves against these claims, in front of a single court simultaneously and efficiently before ultimately reaching resolution without unnecessary duplication of effort and expense that separate actions would present. The benefits of proceeding with this procedural mechanism, including providing injured persons with a method of obtaining redress for claims that might not be

practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this case as a class action.

## VII.    CAUSE OF ACTION

### COUNT ONE
### Conspiracy in Restraint of Trade - Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

350.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

351.    Plaintiffs seek monetary and injunctive relief on behalf of themselves and all other members of the Class under Section 4 of the Clayton Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

352.    Beginning no later than June 28, 2018, Defendants formed and engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

353.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants for Casino-Hotel Defendants to knowingly and collectively use the Rainmaker pricing algorithm platform and engage in other related types of reinforcing conduct to fix, stabilize, and artificially increase the price of rooms rented directly to guests. This conspiracy has caused Plaintiffs and the other Class members to pay artificially inflated prices directly to Casino-Hotel Defendants and their co-conspirators for room rentals in the Atlantic City Casino-Hotel Market during the class period.

354.    As detailed above, the contract, combination, or conspiracy alleged herein has taken the form of a hub-and-spoke conspiracy in which Rainmaker, and later Cendyn, served as the hub and the individual Casino-Hotel Defendants served as spokes.

355.    In furtherance of this contract, combination, or conspiracy, Defendants have committed various acts, including the acts discussed above and those that follow:

(a)   Casino-Hotel Defendants provided current internal pricing and supply data to a single third-party (first Rainmaker and then Cendyn) for use in the Rainmaker pricing algorithm platform;

(b)   Rainmaker, and later Cendyn, sold and operated the Rainmaker algorithm products that provided room pricing recommendations to Casino-Hotel Defendants;

(c)   Casino-Hotel Defendants knowingly used the same pricing algorithm platform that incorporated pricing and supply data from other Casino-Hotel Defendants in recommending optimal room rates for each Casino-Hotel Defendant to charge guests;

(d)   Casino-Hotel Defendants priced their rooms pursuant to the optimal rates the Rainmaker pricing algorithm platform recommended;

(e)   Defendants exchanged competitively sensitive pricing and supply information with each other, including through use of the Rainmaker platform; and

(f)   Defendants engaged in various forms and methods of bilateral and multilateral communication cross various settings and venues concerning room pricing, supply and revenue, including their use of the Rainmaker pricing algorithm platform to set and monitor room rates, that had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

356.   Casino-Hotel Defendants possess market power in the relevant antitrust market: the Atlantic City Casino-Hotel Market. The relevant product market is the market for the rental of guest rooms in casino-hotels, and the relevant geographic market is Atlantic City, New Jersey.

357.   Defendants' contract, combination, or conspiracy has led to anticompetitive effects in the form of supra-competitive prices Plaintiffs and the other Class members have paid directly to Casino-Hotel Defendants for room rentals in the Atlantic City Casino-Hotel Market.

358.     As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for hotel rooms than they would have paid in the absence of the conspiracy.

359.     There are no procompetitive justifications for the Defendants' conspiracy, and any proffered procompetitive justifications, to the extent any exist, could have been achieved through less restrictive means.

360.     Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Antitrust Act. In the alternative, Defendants' conspiracy violates Section 1 of the Sherman Antitrust Act under either a quick look or full-blown rule of reason analysis.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others similarly situated, respectfully requests judgment against Defendants as follows:

A.  The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and Plaintiffs' counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class once certified;

B.  The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed to violate of Section 1 of the Sherman Act;

C.  Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled under applicable law;

D.   Defendants, their affiliates, successors, transferees, assignees, officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.   Plaintiffs and the members of the Class be awarded pre- and post-judgment interest in the maximum amount and to the maximum extent permitted by law;

F.   Plaintiffs and the members of the Class recover their costs of suit and reasonable attorneys' fees to the maximum extent allowed by law; and

G.   Plaintiff and the members of the Class be awarded any other relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial under Federal Rule of Civil Procedure 38(b) on all triable issues.

LITE DEPALMA GREENBERG & AFANADOR, LLC

Dated:  May 9, 2023

*/s/ Mindee J. Reuben*
Mindee J. Reuben
1515 Market Street, Suite 1200
Philadelphia, PA 19102
Tel: (215) 854-4060
mreuben@litedepalma.com

LITE DEPALMA GREENBERG & AFANADOR, LLC
Joseph J. DePalma
Catherine B. Derenze
570 Broad Street, Suite 1201
Newark, NJ 07102
Tel: (973) 623-3000
jdepalma@litedepalma.com
cderenze@litedepalma.com

103

**BURNS CHAREST LLP**
Christopher J. Cormier (*pro hac vice* forthcoming)
Spencer Cox (*pro hac vice* forthcoming)
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Tel: (202) 577-3977
ccormier@burnscharest.com
scox@burnscharest.com

**BURNS CHAREST LLP**
Warren T. Burns (*pro hac vice* forthcoming)
Hannah M. Crowe (*pro hac vice* forthcoming)
900 Jackson Street, Suite 500
Dallas, TX 75202
Tel: (469) 904-4550
wburns@burnscharest.com
hcrowe@burnscharest.com

**SUSMAN GODFREY L.L.P.**
Vineet Bhatia (*pro hac vice* forthcoming)
Shawn L. Raymond (*pro hac vice* forthcoming)
1000 Louisiana, Suite 5100
Houston, TX 77002
Tel: (713) 651-9366
vbhatia@susmangodfrey.com
sraymond@susmangodfrey.com

**SUSMAN GODFREY L.L.P.**
Stephen E. Morrissey (*pro hac vice* forthcoming)
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 516-3880
smorrissey@susmangodfrey.com

*Counsel for Plaintiffs and the Proposed Class*

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is related to the following civil action:

- Gibson & Valiente v. MGM Resports International, et al
  Civil Action No. 2:23-cv-00140 (Nevada)

I hereby certify that the following statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

LITE DEPALMA GREENBERG & AFANADOR, LLC

Dated:  May 9, 2023

*/s/ Mindee J. Reuben*
Mindee J. Reuben
1515 Market Street, Suite 1200
Philadelphia, PA 19102
Tel: (215) 854-4060
mreuben@litedepalma.com

LITE DEPALMA GREENBERG & AFANADOR, LLC
Joseph J. DePalma
Catherine B. Derenze
570 Broad Street, Suite 1201
Newark, NJ 07102
Tel: (973) 623-3000
jdepalma@litedepalma.com
cderenze@litedepalma.com

BURNS CHAREST LLP
Christopher J. Cormier (*pro hac vice* forthcoming)
Spencer Cox (*pro hac vice* forthcoming)
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Tel: (202) 577-3977
ccormier@burnscharest.com
scox@burnscharest.com

BURNS CHAREST LLP
Warren T. Burns (*pro hac vice* forthcoming)
Hannah M. Crowe (*pro hac vice* forthcoming)
900 Jackson Street, Suite 500
Dallas, TX 75202
Tel: (469) 904-4550
wburns@burnscharest.com
hcrowe@burnscharest.com

105

**SUSMAN GODFREY L.L.P.**
Vineet Bhatia (*pro hac vice* forthcoming)
Shawn L. Raymond (*pro hac vice* forthcoming)
1000 Louisiana, Suite 5100
Houston, TX 77002
Tel: (713) 651-9366
vbhatia@susmangodfrey.com
sraymond@susmangodfrey.com

**SUSMAN GODFREY L.L.P.**
Stephen E. Morrissey (*pro hac vice* forthcoming)
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 516-3880
smorrissey@susmangodfrey.com

*Counsel for Plaintiffs and the Proposed Class*